1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEW MEXICO

3     UNITED STATES OF AMERICA,

4                     Plaintiff,

5          vs.                         CR-12-1393 MCA

6     ALTAR DARNELL WELLAMS,

7                     Defendant.

8

9                     Transcript of Motion to Suppress Evidence

10    before THE HONORABLE M. CHRISTINA ARMIJO, Chief United

11    States District Judge, held in Albuquerque, Bernalillo

12    County, New Mexico, commencing on Wednesday, October 3,

13    2012, at 2:14 p.m.

14                     Proceedings recorded by mechanical

15    stenography; transcript produced by computer-aided

16    transcription.

17                    A P P E A R A N C E S

18    For the Plaintiff United States of America:

19          UNITED STATES ATTORNEY'S OFFICE
            District of New Mexico
20          201 Third Street, Northwest, Suite 900
            Albuquerque, New Mexico  87102
21          BY:  MR. JAMES R.W. BRAUN

22    For the Defendant Altar Darnell Wellams:

23          KNOBLAUCH LAW OFFICE
            Attorney at law
24          1412 Lomas Boulevard, Northwest
            Albuquerque, New Mexico  87104
25          BY:  MR. CHARLES E. KNOBLAUCH

1    Reported by:

2         JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
          United States Court Reporter
3         333 Lomas Boulevard, Northwest
          Albuquerque, New Mexico  87102
4         Phone:  (505)348-2209
          Fax:  (505)348-2315
5

6

7                        I N D E X

8                                              PAGE

9    WITNESSES FOR THE PLAINTIFF:

10     JARRELL PERRY

11        Direct Examination by Mr. Braun          6

12        Cross-Examination by Mr. Knoblauch       32

13        Redirect Examination by Mr. Braun        48

14        Recross Examination by Mr. Knoblauch     50

15        Examination by the Court                 50

16   ARGUMENT BY MR. KNOBLAUCH                     53

17   ARGUMENT BY MR. BRAUN                         56

18

19                   EXHIBITS ADMITTED

20                                              PAGE

21   Exhibit 1                                     5

22   Exhibit 1-A                                   5

23   Exhibit 2                                     5

24

25


                JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                   333 Lomas Boulevard, Northwest
                   Albuquerque, New Mexico 87102

1                    Motion to Suppress Evidence

2                 (Court in session at 2:14 p.m.)

3            THE COURT:  All right.  Do we have that working?

4            MR. BRAUN:  We do.

5            THE COURT:  All right.  Let us proceed, then.

6     Let me at this time call the case of United States v. Altar

7     Darnell Wellams, W-E-L-L-A-M-S.  This is on the Court's

8     Criminal Docket, 12-CR-1393.

9            May I have appearances, please?

10           MR. BRAUN:  James Braun on behalf of the United

11    States.  And with me is Raquel Ruiz-Velez, who is a Special

12    Assistant U.S. Attorney, although she's not appearing in

13    this case.

14           THE COURT:  Good afternoon.

15           MS. RUIZ-VELEZ:  Good afternoon.

16           MR. KNOBLAUCH:  Charlie Knoblauch.  I'm here on

17    behalf of Mr. Wellams, who is present before the Court,

18    Your Honor.

19           THE COURT:  Good afternoon, counsel.  All right.

20    Just give me a moment here.  All right.

21           The matter before the Court this afternoon is the

22    defendant's motion to suppress certain evidence in this

23    case.  I certainly can provide counsel with a brief

24    opportunity for an opening statement, but I find that if

25    there's going to be evidence presented here, that we

1          probably should proceed directly to the evidence.

2                    How do you wish to proceed?

3                    MR. BRAUN:  We would be happy to do that, Your

4          Honor.

5                    MR. KNOBLAUCH:  Sounds reasonable, Judge.

6                    THE COURT:  All right.  Mr. Knoblauch, this is

7          your motion.  You may proceed.  How do you want to handle

8          this?  Because are you calling -- is the agent going to be

9          called initially?

10                    MR. BRAUN:  We would call the agent, Your Honor.

11                    MR. KNOBLAUCH:  We're stipulating to the

12          admission of one CD recording and also the transcript of

13          that recording.

14                    THE COURT:  Do you have copies there?

15                    MR. BRAUN:  Yes, Your Honor.

16                    THE COURT:  All right.

17                    MR. BRAUN:  We also have a photograph marked as

18          Exhibit 2.  It's a transcript, and the photograph, and a

19          copy of the CD.

20                    THE COURT:  All right.  So there are three

21          stipulations?  These are to be considered evidence here:

22          Exhibit Number 1, which is the CD recording; Exhibit Number

23          1-A, the transcript of that recording, the written

24          transcript; and Exhibit 2, which is a photograph of the

25          bundle?

```
 1              MR. KNOBLAUCH:  That is correct, Your Honor.

 2              THE COURT:  All right.  They are admitted.

 3              (Exhibits 1, 1-A, and 2 admitted into evidence.)

 4              THE COURT:  Now, how are you going to proceed?

 5    Or how do you wish to proceed?

 6              MR. KNOBLAUCH:  I think probably the best way to

 7    proceed, for all involved, would be -- we'd be willing to

 8    waive any sort of opening at this point, and I believe the

 9    government is going to do that, also, and just have Agent

10    Perry called to the stand.

11              THE COURT:  That's fine.

12              MR. KNOBLAUCH:  For his testimony.

13              THE COURT:  That's fine.

14              MR. BRAUN:  I would be happy to put him on first.

15              THE COURT:  Okay.

16              MR. BRAUN:  If it please the Court.

17              THE COURT:  That's fine.

18              MR. BRAUN:  The United States calls Special Agent

19    Jay Perry.

20              COURTROOM DEPUTY CAROL BEVEL:  Please raise your

21    right hand.

22              You do solemnly swear that your testimony in this

23    matter shall be the truth, the whole truth, and nothing but

24    the truth, so help you God?

25              THE WITNESS:  Yes, ma'am, I do.
```

1          COURTROOM DEPUTY CAROL BEVEL:  Please be seated.

2     Please state your name and spell your last name for the

3     record.

4          MR. KNOBLAUCH:  Your Honor, I might invoke the

5     rule.  I don't think it's necessary, but just as a formal

6     action.

7          THE COURT:  If there is anyone present in the

8     courtroom who is intended to be a witness in this case for

9     either the government or the defendant, I would ask that

10    they remain outside the courtroom until such time as he or

11    she is called to testify.  Otherwise, this is a public

12    hearing.

13         And let us proceed.

14         MR. BRAUN:  Thank you, Your Honor.

15         THE COURT:  All right.

16         MR. BRAUN:  Please state your name.

17         THE WITNESS:  My name is Jarrell Perry,

18    P-E-R-R-Y.

19                   JARRELL PERRY,

20        after having been first duly sworn under oath,

21        was questioned and testified as follows:

22                   DIRECT EXAMINATION

23    BY MR. BRAUN:

24    Q.  How are you employed?

25    A.  I'm a special agent with the Drug Enforcement

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico 87102

1    Administration.

2    Q.   How long have you been a special agent with DEA?

3    A.   September 14 of this year was my 14th year.

4    Q.   And prior to that, did you have any law enforcement

5    experience?

6    A.   Yes, sir, I did.

7    Q.   What was that?

8    A.   I was a police officer for the City of Knoxville,

9    Tennessee, for approximately six and a half years prior to

10   being hired by DEA.

11   Q.   So you have over 20 years total, then, of law

12   enforcement experience?

13   A.   Yes, sir.

14   Q.   And what training have you had to be first a police

15   officer, and then a DEA special agent?

16   A.   Prior -- after being hired by Knoxville City Police

17   Department, I went through a 22-week police academy that

18   was put on by the City of Knoxville.  And then prior to

19   coming to Albuquerque, after being hired by DEA, I went

20   through a 17-week DEA academy in Quantico, Virginia.

21   Q.   Okay.  And where are you assigned with the DEA?

22   A.   Here in Albuquerque.

23   Q.   And are you assigned to a particular group?

24   A.   Yes, sir.  I'm assigned to Group One.  Basically, I'm

25   assigned to a subgroup of Group One, which we term as an

1    interdiction group.

2    Q.   Okay.  And can you describe for the Court what

3    interdiction work is?

4    A.   Basically, we work at various means of public

5    transportation here in Albuquerque; sometimes we vary

6    outside of Albuquerque.  But we work at the Amtrak train

7    station; Greyhound bus station; various other bus stations;

8    sometimes at packaging services such as UPS and FedEx; and

9    occasionally at the Albuquerque International Airport.

10          We attempt to interdict or intercept drug and/or

11   money couriers that are either transporting or carrying

12   illegal narcotic or proceeds from illegal narcotics

13   throughout the country.

14   Q.   And have you had any specific training in how to do

15   this type of interdiction work?

16   A.   Yes, sir, I have.  When I first was assigned to the

17   interdiction unit approximately 13 years ago, I attended, I

18   think for six, maybe seven years, what is termed a Sky Narc

19   Conference; basically, a conference that pertains

20   specifically to interdiction, how to work various bus

21   companies, packaging services, trains.  And it specifically

22   is how to do consensual encounters, the current laws,

23   packaging methods, transportation methods of illegal

24   narcotics and proceeds from illegal narcotics.

25   Q.   Okay.  Have you received any awards for your work in

1     interdiction cases?

2     A.  Yes.  Back in 2006, I was given an award by the Sky

3     Narc Conference, which is basically the International

4     Narcotics Interdiction Association puts on a conference,

5     and they have an agent or officer of the year every year.

6     And in 2006, I was awarded with that award.

7     Q.  Can you approximate how many seizures of both illegal

8     narcotics and U.S. currency you have made as a member of

9     DEA over the last 13 years or so?

10    A.  I don't know the exact amount, but I know it has been

11    over 1,000 cases.

12              THE COURT:  1,000 cases?  Or 1,000 seizures?

13              THE WITNESS:  Well, it's basically the same

14    thing.  When we have a case, that has to have some type of

15    either seizure of illegal narcotics or currency.

16              THE COURT:  Okay.

17    Q.  (By Mr. Braun)  And these are cases where you were

18    either the case agent or you were assisting another agent?

19    A.  Yes.  I was either the case agent, which the majority

20    of them, I was; or I was the co-case agent.

21    Q.  And how many of those seizures involved contraband

22    strapped to a person's body?

23    A.  I don't know the exact amount, but it has been in the

24    hundreds.

25    Q.  Okay.  Now, on a given day, how do you select where

1    you're going to do your interdiction work?

2    A.  Well, we work, as I stated earlier, various means of

3    public transportation, but specifically the duties I'm

4    working currently, and have for the last year and a half,

5    two years, is specifically the Amtrak train and the

6    Greyhound bus station.

7              I know the schedules for those buses and trains.

8    And depending on vacation or court or meetings or whatever

9    is going on, I'm at the bus station or the train station on

10   a daily basis.

11   Q.  And in Albuquerque, where are the Amtrak station and

12   the Greyhound station in relation to each other?

13   A.  The actual station is in the same location.  It's 320

14   First Street.  But they're in the same building.  The

15   ticket counters are actually right across from one another.

16   And the train and the buses stop probably within 50 yards

17   of each other.

18   Q.  Okay.  So if you could describe the layout of the

19   Greyhound portion of the building for the Court?

20   A.  The building has a half of a circle in the front.  That

21   is for, basically, passenger drop-off and pick-up.  Once

22   you walk inside of the building, as stated earlier, the

23   Amtrak and Greyhound is together.  To the right side is the

24   Greyhound ticket counter; to the left side is the Amtrak

25   ticket counter.

1          As you walk into the station, the station opens

2     up.  It has a large seating area in the middle.  It has

3     men's and women's bathrooms.  To the left side is the food

4     court.  It has a grill.  If you turn right inside the

5     station, that is what they consider the passenger boarding

6     area for the Greyhound buses.  They have, I believe, five

7     different doors and a seating area there.  On the doorways,

8     it has the names of the cities of where you're traveling to

9     so you'll know which door to go to.

10          Once you go outside of those boarding doors, they

11    have a breezeway and a walkway.  And then they have, I want

12    to estimate between eight to ten parking spots for buses.

13    They're at an angle in the parking lot.  That's where the

14    buses pull in when they arrive, and also when they load up

15    the passengers.

16          If you go farther south in the parking lot, there

17    is a, what we consider -- what Greyhound considers as a

18    wash bay where the bus is washed, where it's serviced while

19    during its stay here in Albuquerque.

20    Q.  And if you -- when you are doing your interdiction work

21    at the Greyhound station, what exactly do you do?

22    A.  Generally, if it's a normal day, I like to be there

23    when the bus arrives, to watch the passengers -- to watch

24    the bus arrive and watch the passengers deboard the bus.

25    When I say "deboard," every passenger has to get off the

1     bus here in Albuquerque because the bus is serviced here,

2     so every passenger gets off.  I like to watch the

3     passengers get off, to see who's carrying luggage, what

4     order they get off in, and just to watch what the

5     passengers do.

6              Then the bus is driven back to that wash bay that

7     I referred to earlier and is serviced.  It's fueled, it's

8     washed, it's cleaned.  When that happens, generally I walk

9     down to that wash bay, and I board the bus and I look at

10    the luggage that is what I refer to as on top of the bus,

11    the seating area where the passengers are.  You can take

12    your luggage off the top of the bus, the luggage you

13    carried on, or you can leave it on the bus, whichever you

14    choose to do.

15             So I like to look at that luggage, and also I

16    might look at -- sometimes I look at the luggage that's

17    underneath the bus, prior to the passengers reboarding.

18             Once the bus is serviced, then the driver does

19    his checks of the bus.  They make an announcement.  When

20    you deboard the bus, they give you what's called a boarding

21    pass.  It has a three-digit number on it, and they'll call

22    out that number.  It's either like 363 or 7 -- whatever the

23    number is.  And they make that announcement over the

24    intercom.  And when they make that announcement, I

25    generally board the bus, and as the passengers are

1    reboarding, I conduct consensual encounters with the

2    passengers as they are reboarding the bus.  That's my

3    normal practice.

4    Q.  Okay.  You mentioned conducting consensual encounters.

5    What is a consensual encounter?

6    A.  A consensual encounter is basically a voluntary

7    conversation between law enforcement, a member of law

8    enforcement and a private citizen.  That is basically a

9    voluntary conversation.

10   Q.  And can you describe how you generally engage in a

11   consensual encounter?

12   A.  Yes, sir.  When I approach a person that I wish to

13   speak with, on the bus or outside or wherever, on the train

14   station, I display my badge to them, which I carry in my

15   left rear pocket.  I identify myself as a police officer.

16   After doing that, I return my badge to my left rear pocket,

17   is where I keep it.

18          I ask permission to speak with them.  If they

19   grant me permission to speak with them, then I ask them

20   various questions about their travel, and then I ask them

21   questions concerning luggage, if they have luggage with

22   them.  I ask them where they live.  I may ask them for

23   their bus ticket or train ticket, or their identification.

24   And then I subsequently ask them if they have luggage with

25   them.

```
1              If they identify luggage, I ask consent to search
2       the luggage for contraband.  And then after doing that, I
3       search passengers' persons, or their bodies, also for
4       contraband, if they give permission.  And then once doing
5       that, I go on to the next passenger or the next person I
6       wish to speak with.
7              THE COURT:  Mr. Braun, let me interrupt you for
8       just a minute.  Let me confer with my staff for just a
9       minute.
10             (A discussion was held off the record.)
11             THE COURT:  All right.  Let us continue here.
12      Q.  (By Mr. Braun)  And when you conduct these consensual
13      encounters, do you generally try to record those
14      encounters?
15      A.  Yes, sir.
16      Q.  With what type of device do you record the encounters?
17      A.  It's a digital recorder that I carry around my -- it's
18      around my neck with a -- attached to a lanyard.  It's
19      underneath of my shirt.
20      Q.  Directing your attention to May 24, 2012, were you
21      working interdiction on that day?
22      A.  Yes, sir, I was.
23      Q.  And what did you do when you came on duty that morning?
24      A.  I don't remember exactly the first thing I did, but I
25      probably went to the office and did paperwork.  And then
```

1    the first place that I went to for interdiction-wise, I

2    went to the Amtrak train station and spoke with various

3    passengers on the Amtrak train.  Then I went over to the

4    Greyhound bus.

5    Q.  Okay.  And what did you do when you got to the

6    Greyhound bus?

7    A.  The passengers had already started reboarding the bus.

8    The majority of the passengers were actually already on the

9    bus.  So I boarded the bus and walked to the rear and began

10   conducting consensual encounters with the passengers.

11   Q.  Okay.  And about what time was this?

12   A.  I don't know the exact time.  The bus is scheduled to

13   depart at 11:10 a.m.  I would estimate it was around five

14   minutes to 11:00, maybe 11:00 a.m.

15   Q.  So you would not have been able to see the passengers

16   deboard and then do the routine you normally follow, that

17   you talked about?

18   A.  No, sir.  I did not on that date.

19   Q.  And were you working with another agent on that day?

20   A.  Not on this day, I was not.

21   Q.  So when you went onto the bus, you were by yourself?

22   A.  That's correct.

23   Q.  And what did you do then, when you boarded the bus?

24   A.  I walked to the rear, which is my practice.  I like to

25   start at the rear of the bus and speak with passengers,

1    which I did.  I went to the rear of the bus and conducted

2    consensual encounters and then moved forward with the

3    various passengers.

4    Q.  What were you wearing that day?  Do you recall?

5    A.  I don't recall exactly what I was wearing.  It was in

6    May.  Most days I wear, when it's warmer, I wear shorts and

7    generally an untucked, like a polo shirt, short-sleeved

8    shirt.  Sometimes I wear jeans.  But we don't have

9    uniforms, so that's basically -- I know I was wearing

10   either one of those two types of clothing.

11   Q.  So you weren't wearing any jacket or anything with a

12   DEA insignia on it?

13   A.  No, sir.

14   Q.  Were you armed?

15   A.  Yes, I was.

16   Q.  Where was your firearm?

17   A.  On my right side.  It was concealed underneath of my

18   shirt that I was wearing.  That was untucked.

19   Q.  So it was not visible?

20   A.  It was not visible.

21   Q.  And where was your badge?

22   A.  It was in my left rear pocket, which is where I keep it

23   all the time.

24   Q.  And as you were performing these consensual encounters,

25   if you could tell the Court what you were doing?

1    A.   I'm sorry?  I couldn't hear you.

2    Q.   If you could tell the Court what you were doing as you

3    went down the bus, performing the consensual encounters?

4    A.   I started at the rear.  I removed my DEA badge from my

5    left rear pocket, with each passenger.  If they were

6    traveling together, two people traveling together, I spoke

7    with them and displayed my badge to them; identified myself

8    as a police officer; asked for permission to speak with

9    them.

10          I asked various questions about travel:  Where

11   are you traveling to?  Where are you traveling from?  Where

12   they lived, and if they had luggage with them, and the

13   location.

14          I spoke with numerous passengers that were at the

15   rear of the bus and then began to move forward.

16   Q.   Okay.  Now, were you able to record your encounters on

17   this day?

18   A.   Yes, I was.

19          MR. BRAUN:  If I might have just a moment, Your

20   Honor?

21          THE COURT:  Certainly.

22          MR. BRAUN:  My computer turned itself off.

23          THE COURT:  They're known to do that.

24          MR. BRAUN:  May I approach the witness?

25          THE COURT:  You may, counsel.

1    Q.  (By Mr. Braun)  I'm going to hand you what has been

2    marked and already admitted as Government's Exhibit 1 and

3    Government's Exhibit 1-A.  Starting with Exhibit 1, do you

4    recognize that?

5    A.  Yes, I do.

6    Q.  What is that?

7    A.  It's a CD that I believe is a recording of the

8    consensual encounter that -- encounters that I conducted on

9    the bus on May 24.

10   Q.  Have you listened to that recording?

11   A.  Yes, I have.

12   Q.  Does it accurately depict what happened on that morning

13   at the Greyhound bus?

14   A.  Yes, it does.

15   Q.  And have you read the transcript marked as Exhibit 1-A?

16   A.  Yes, sir, I have.

17   Q.  Does it accurately depict the contents of Exhibit 1?

18   A.  Yes, sir, it does.

19          MR. BRAUN:  Your Honor, may I play a portion of

20   Exhibit 1?

21          THE COURT:  You may.

22          MR. BRAUN:  Just so the Court is aware, there is

23   one consensual encounter on the recording that is not on

24   the transcript, and so you'll hear a portion before we get

25   to what is at the top of Page 3 on the transcript.

```
 1              THE COURT:  Okay.
 2              (CD recording played.)
 3    Q.  And if I could stop right there for just a moment.  You
 4    heard in the background someone say, "If I could just have
 5    everybody stay in your seats, please."  Who was that
 6    speaking?
 7    A.  That's the bus driver.
 8    Q.  So that was not you?
 9    A.  No, that was not me.
10    Q.  And as you were performing the consensual encounters,
11    were the passengers all seated?
12    A.  No.  They were still boarding the bus, and some of
13    them were putting their luggage up and standing in the
14    aisleway.
15    Q.  So were some seated and some standing?
16    A.  Yes.
17    Q.  Okay.  And were people who wanted to get on or off the
18    bus able to get around you?
19    A.  Yes.
20              (CD recording played.)
21    Q.  I'm going to go ahead and stop right there.  Could you
22    describe in a little more detail for the Court a little
23    more about the consensual encounters that we just heard on
24    the audio?
25    A.  That last encounter was a passenger who was seated
```

1    on the right-hand side of the bus.  He was seated

2    approximately five to six seats from the rear of the bus,

3    in the window seat.  And as you heard on the recording, I

4    identified myself as a police officer, asked for permission

5    to speak with him, which he gave me permission.  I asked

6    him about luggage, and where he was traveling to, and

7    details.

8              He was traveling to Memphis, coming from

9    Phoenix.  He said he lived in Memphis, and he stated that

10   he had no luggage with him.  I subsequently asked him if he

11   had his ticket with him, which he gave me.  I reviewed his

12   ticket and returned it to him.  I observed he had a pillow

13   in the seat with him, a small pillow.  I asked him if he

14   would give me permission to search the pillow for

15   contraband, which he did.  He handed it to me.  I searched

16   it with negative results and immediately returned it to

17   him.

18             Then I asked him for consent to search his person

19   for contraband, which he did give permission.  I conducted

20   a search of his person, with negative results for

21   contraband.

22   Q.  So at point, what did you do?

23   A.  I walked a couple of steps forward and spoke with the

24   defendant in this case.

25   Q.  Okay.  And do you see the defendant in the courtroom

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico 87102

 1    today?

 2    A.  Yes, sir, I do.

 3    Q.  Can you describe him, please?

 4    A.  He is seated at defense counsel table beside Mr.

 5    Knoblauch.  He's wearing a red-colored jumper, a white

 6    T-shirt underneath.  He has a goatee and a shaved head.

 7    Q.  Okay.  Now, where was the defendant seated in relation

 8    to this gentleman that you just had the consensual

 9    encounter with?

10    A.  He was one seat forward and across the aisleway.

11    Q.  So approximately how many feet away?

12    A.  I would estimate maybe five to six feet away.

13    Q.  So you approached the defendant, you said?

14    A.  Yes, sir, I did.

15    Q.  What happened?

16    A.  I displayed my -- I removed my badge from my left rear

17    pocket; displayed it to him; identified myself as a police

18    officer.  Well, the first thing I said was, "Hello, sir.

19    How you doing today?"  Then I displayed my badge and

20    identified myself as a police officer.  I asked for

21    permission to speak with him.  He moved his head in an

22    up-and-down position, and he said, "Yeah."  And then I

23    asked him various questions.

24    Q.  What happened then?

25    A.  The questions I asked him, I asked him where he was

1    traveling to.  He said that he was going to Memphis.  I

2    asked him where he was traveling from.  He stated Arizona.

3    I asked him if he lived in Memphis or Arizona.  He stated

4    "neither," he was just visiting.  So then I asked him where

5    he lived.  He stated he lived in Michigan.

6              At that time, I asked him for his bus ticket.  He

7    handed me his ticket.  I looked at it and returned it to

8    him.  I asked him if he had any luggage with him.  He said,

9    "No, I do not."

10             I had confirmed and asked him if he had any

11   luggage above or below the bus, and he said, "No."

12   Q.  Based upon your training and experience, was that

13   suspicious to you, the fact that he did not have any

14   luggage with him?

15   A.  Yes, it was suspicious to me.

16   Q.  So you asked for his ticket.  What happened?

17   A.  After I reviewed it, I returned it to him then, after I

18   asked about the luggage.  And then I asked him if he had

19   anything on his person.  No, I take that back.  The next

20   thing I did, I observed a pillow he had sitting in the seat

21   behind him.  It was a small pillow.  Basically, it was the

22   exact same size and actually the same color as the pillow

23   of the individual that I had just spoken with.

24             I asked him if the pillow belonged to him.  He

25   said, "Yes."  I asked him if he would give me permission

1    to search that pillow for contraband.  He said, "No

2    problem."  He handed me the pillow.  I searched it, with

3    negative results, for contraband, returned it to the

4    defendant.

5              At that time, I asked him if he had anything, any

6    weapons or anything strapped to his person.  His statement

7    was, "My person?"  I took that as meaning he was asking a

8    question, what "my person" means, so I explained to him

9    that his person basically was on his body.

10             And he said -- well, he said, "No."  And then I

11   asked him for permission to search his person for

12   contraband.  And he said, "You want to search my person?

13   I don't have a problem."  So -- but then he didn't

14   understand.

15             So I subsequently asked him -- I explained to him

16   that -- he asked me if it was necessary.  I explained to

17   him that I was asking for permission to search his person.

18   He basically said he didn't understand; that it was his

19   first time on the bus; he really didn't know what was going

20   on.

21   Q.  Okay.

22   A.  So I explained to him basically why I wanted to search

23   his person and why we're there; basically, that sometimes

24   we have passengers, due to the lack of security, that do

25   have things strapped to their body, specifically illegal

1    narcotics, weapons, and that we do conduct searches of

2    people's persons on the bus and I tried to speak with every

3    passenger.

4    Q.   Okay.  Let me go ahead, then, and play the recording up

5    to that point.

6    A.   Okay.

7              (CD recording played.)

8    Q.   I'm going to stop right there.  When he asked, "Do we

9    need to leave out of here?" was it your impression that he

10   was actually asking to leave?

11   A.   No, I don't think he was asking to leave.  He was

12   asking -- in my opinion, he was asking, "Do we need to

13   leave out of here to conduct the search?"  And I told him,

14   "No, we don't need to leave.  You can go wherever -- you

15   know, if you want to leave, it's up to you.  You don't have

16   to go anywhere."

17   Q.   So at any time during your encounter did he try to

18   leave?

19   A.   No, he did not.

20   Q.   Did you prevent him from getting up and leaving?

21   A.   No, I did not.

22   Q.   Okay.  And when you said, "Can you lift up your shirt

23   for me and show me what's underneath your shirt?" were you

24   asking for permission from him to do that, or were you

25   demanding that he do that?

1   A.  I asked him permission to lift up his shirt.

2   Q.  Could you describe what he was wearing?

3   A.  He was wearing a short-sleeved button-up shirt.  It was

4   buttoned all the way from -- kind of like a short-sleeved

5   dress shirt.  It was kind of baggy.  It was long.  It was

6   untucked.  He was wearing tan-colored shorts.  The shirt

7   was untucked, and as he was sitting down it covered the

8   whole top portion of his leg area, down below his knees.

9   Q.  So when you asked if he would lift up his shirt, what

10  was his response?

11  A.  He immediately lifted up the bottom of his shirt.

12  Q.  And what did you observe?

13  A.  As soon as he did that, immediately I observed a

14  square-shaped bundle that was in his crotch area underneath

15  of his shorts.  It was protruding from his shorts.

16  Q.  And when you say "protruding," you did not see the

17  package, itself, did you?

18  A.  No, but it was obvious.  It was -- I mean, it was

19  underneath his shorts.  It was obviously lying there, is

20  the first thing I noticed.

21  Q.  You could see the outline of the package?

22  A.  Yes, sir.

23  Q.  Based upon your training and years of experience and

24  other seizures that you've made, did you have an opinion as

25  to what this was?

1    A.   Yes, I did.

2    Q.   And what was that opinion?

3    A.   I believe from, as you stated, my experience, it was a

4    package of contraband; specifically, a package of illegal

5    narcotics.

6    Q.   Okay.  So at that point, what did you do?

7    A.   I asked the defendant what was in his crotch.  His

8    answer was, "That's me."  I informed him that, "I know

9    that's not you.  I can see a bundle.  Is it a weapon?"

10   He said, "No."  I asked him if it was a bundle.  And he

11   moved his head in an up-and-down position.  When he did

12   that, I asked him if that nod meant "Yes," and he stated,

13   "Yes."

14          And then I asked him if the bundle was something

15   illegal, and he didn't give a verbal response.  He tilted

16   his head slightly to the left.  He raised his eyebrows, and

17   he gave what I would term as a closed-mouth smirk.

18   Q.   What was your impression of his response?

19   A.   My impression of his nonverbal response was like,

20   basically:  It is what it is.  It's there.

21          I mean, I didn't take it as a "Yes" or a "No"

22   but -- I mean, it was basically a response that:  It's

23   there, and you see it.

24   Q.   And at that point, what did you do?

25   A.   I asked the defendant to place his hands up on the back

1     of the seat in front of him, which he did.  I felt the

2     bundle.  It was a hard, like a square-shaped bundle, the

3     same thing I had just seen.  And then I felt it, and I

4     knew, from my training and experience, that it was

5     definitely a package or a bundle of illegal narcotics.

6              And the defendant was -- I informed him to stand

7     up, which he did, and then I placed handcuffs on him.

8     Q.  Okay.  I'm going to go ahead and play the rest of the

9     recording.

10             (CD recording played.)

11    Q.  And is that the end of the recording?

12    A.  Yes, sir.

13    Q.  So after you placed the defendant under arrest then and

14    handcuffed him, what did you do?

15    A.  I grabbed the pillow.  That was the only thing that he

16    said he had as property.  And I began to walk him off the

17    bus, and there were passengers that were standing in the

18    aisleway and maybe still reboarding the bus.  The aisleway

19    was blocked, so we stopped for a few minutes until I could

20    get the aisleway cleared, and then walked the defendant off

21    the bus.

22    Q.  Okay.  Where did you take him?

23    A.  Into a private room inside of the Greyhound bus

24    station.

25    Q.  What happened there?

1    A.   I unzipped his pants.  I wanted to see the bundle,

2    see the packaging.  When I did that, the bundle was not

3    there.

4    Q.   Did that surprise you?

5    A.   Yes.  It was surprising to me, yes.

6    Q.   So what did you do?

7    A.   I walked the defendant back out of that private room,

8    back onto the bus, to attempt to locate the bundle that I

9    had just seen and felt on the bus.

10    Q.   What did you do on the bus?

11    A.   I went back to where the defendant was originally

12    seated.  I had him a few seats forward of that seat.  I

13    went down and looked underneath the seat and was looking

14    for the bundle.  And an employee who was on the bus got my

15    attention at that time.

16    Q.   Okay.  And what did the employee say to you?

17    A.   Well, he called my name.  He was standing a few feet in

18    front of me, and he was holding a square-shaped gray

19    duct-taped bundle in his hands.  And I took possession of

20    the bundle.

21    Q.   Okay.  Did the defendant say anything around that time?

22    A.   Not at that time.  He did as I was walking him off the

23    bus.

24    Q.   Okay.  What did he say?

25    A.   He stated that, "I didn't purposely remove that from --

1    remove that.  As we were walking off the bus, it fell off

2    of me, onto the floor."

3    Q.  And when he said that, what was your impression of what

4    he was referring to?

5    A.  The bundle that we had just -- that I had in my hands,

6    that I had just found on the bus.

7    Q.  And when you took him off the bus, was that pretty much

8    immediately after the employee gave you the package?  Or

9    did you do anything else on the bus?

10   A.  No, it was immediately, we walked right off the bus.

11   Q.  Okay.  And the defendant's statement, was that in

12   response to any questioning by you?

13   A.  No, I didn't question him.  It was still while he was

14   on the bus, we walked down the aisleway.

15   Q.  So just as you were walking, he stated that?

16   A.  Yes.

17   Q.  Where did you take him at that point?

18   A.  To my car, and I transported him back to the DEA

19   office.

20   Q.  What happened at the DEA office?

21   A.  He was placed into a holding cell.  Prior to being

22   placed in a temporary holding cell, he was strip-searched,

23   and he had a -- when I did that, he had a piece of gray

24   duct tape around his waist, that went down to the front of

25   his crotch area, that was attached to his shirt or his

1    body.

2    Q.  Okay.

3           MR. BRAUN:  May I approach the witness?

4           THE COURT:  You may, counsel.

5    Q.  I'm going to hand you what's been admitted and marked

6    as Exhibit 2.  Do you recognize that?

7    A.  Yes, I do.

8    Q.  What is that?

9    A.  That's the bundle that was removed from the defendant

10   on May 24.  It's a photograph that was taken by me at the

11   DEA office.

12   Q.  And is that photograph a fair depiction of the bundle

13   you seized that day?

14   A.  Yes.

15   Q.  And what was inside of the bundle?

16   A.  There was a smaller bundle on top.  The main portion,

17   the larger part, contained a whiteish-colored powdered

18   substance; and then the top part contained a hard, like a

19   brownish-colored rock-like type substance.

20   Q.  Have you received lab results for those two different

21   substances?

22   A.  Yes.

23   Q.  What were the results?

24   A.  The larger bundle came back testing positive for the

25   presence of cocaine, and the smaller bundle tested positive

 1       for cocaine base.

 2       Q.  And the duct tape that you say you found wrapped around

 3       his waist, was it similar to the duct tape that was wrapped

 4       around these packages?

 5       A.  Yes.  It was gray duct tape.

 6       Q.  After you strip-searched the defendant and found that

 7       duct tape on his person, what did you do?

 8       A.  Well, we processed the drug exhibits; and then the

 9       defendant was processed; and then subsequently I read him

10       his Miranda rights in the presence of another agent at the

11       DEA office.

12       Q.  And when you read a defendant their Miranda rights, do

13       you use a form?

14       A.  Yes.  We use a form, DEA form 13-A, which is basically

15       an Advice of Miranda Rights card.

16       Q.  What was the defendant's response after being advised

17       of his Miranda rights?

18       A.  I advised him of his rights and asked him if he was

19       going to answer questions.  He said he would be willing to

20       answer questions but not without someone present to look

21       out for his interests.

22       Q.  And how did you interpret that statement?

23       A.  That basically he was asking for an attorney.

24       Q.  So did you question him at that point?

25       A.  No, I did not.  No questions were asked of him.

1    Q.  But did he make any statements?

2    A.  Yes, he did.  He made a few statements.

3    Q.  What did he say?

4    A.  He stated, "I put my hand in the" -- and he used a

5    curse word -- "in the cookie jar, and it's still in there."

6    And he also said, "I did what I did, and I have to make

7    money."  He stated, "I shove money in people's faces, and I

8    get what I want."

9    Q.  And were those statements in response to any

10   questioning at all on your part?

11   A.  No.

12               MR. BRAUN:  I pass the witness, Your Honor.

13               THE COURT:  You may cross-examine, counsel.

14               MR. KNOBLAUCH:  Thank you.

15                        CROSS-EXAMINATION

16   BY MR. KNOBLAUCH:

17   Q.  Good afternoon, Agent Perry.

18   A.  Good afternoon.

19   Q.  As part of your job, you go to the various -- all of

20   the transportation places around town; is that right?

21   A.  Sir, I'm having a little bit of difficulty hearing you.

22   Q.  As part of your job, you go to various public

23   transportation places around town; is that right?

24   A.  Yes.

25   Q.  You said the airport?

1   A.  Occasionally.  That's very rare.

2   Q.  But primarily the Amtrak; is that correct?

3   A.  Yes, sir.

4   Q.  And the bus station?

5   A.  Yes, sir.

6   Q.  And the Amtrak, that's a government agency, is it not?

7   A.  To my knowledge, I'm not sure if it's a government

8   agency or not.  I have no idea.

9   Q.  Okay.  But the Greyhound is a private agency or private

10  company; is that correct?

11  A.  I believe it is.

12  Q.  And did you receive permission from the Greyhound

13  company to gain access to their facilities?

14          MR. BRAUN:  Objection; relevance.

15          THE COURT:  Counsel, I don't think it's relevant.

16          MR. KNOBLAUCH:  Your Honor, if this agent is

17  trespassing into the private property, without permission,

18  and anybody who was in that private property with

19  permission, with a ticket, you know, would have a superior

20  right to privacy than -- well, not complete privacy, but

21  possibly including somewhat limited privacy in that area.

22          THE COURT:  Mr. Braun?

23          MR. BRAUN:  Your Honor, the defendant had not

24  raised a trespass argument in his motion, even though he

25  was aware of the facts of this case from the reports.  So I

1      would argue that that argument is waived.  And there's no

2      evidence that the agent was trespassing, in any event.

3              THE COURT:  I'm going to permit the question, the

4      answer, if the witness can answer it, but I won't permit

5      him to speculate or guess.  If he doesn't know something,

6      he doesn't know something, and we'll move on.

7              MR. KNOBLAUCH:  Okay.

8      A.  Can you repeat your question, please?

9      Q.  Did you have permission from the Greyhound company to

10     gain access to the interior of their facilities?

11     A.  Yes, I did.

12     Q.  And from whom at the facility?

13             MR. BRAUN:  Objection; relevance.

14             THE COURT:  How is that relevant here, counsel?

15             MR. KNOBLAUCH:  Well, Your Honor, like I said, if

16     he had permission, then he would know exactly who he has

17     permission from.  And I have indications from the Greyhound

18     company nationally that they do not give anyone permission,

19     law enforcement, anyone permission to gain access.  And if

20     some local agent is doing so, I think it would be

21     interesting to know.

22             THE COURT:  Mr. Braun?

23             MR. BRAUN:  This should not be a discovery

24     expedition to find out who, if anyone, gave Agent Perry

25     permission to be there.  Just because the defense might be

1    interested to know who it is, that's not relevant.  The

2    fact is, the agent testified he did have permission to be

3    there.  It doesn't matter by whom.

4          THE COURT:  What do you have to proffer that this

5    agent did not have permission to be there that day?

6          MR. KNOBLAUCH:  He has to have permission from

7    some agent of the company, have permission to be there,

8    and I would like him -- I'd like to know who gave him

9    permission.

10          THE COURT:  If he can answer the question, he can

11    answer it, but I won't permit him to guess or speculation.

12          MR. KNOBLAUCH:  Okay.

13    A.  I was initially given permission, when I started

14    working the Greyhound bus, by the old manager, which was

15    Jason Reeves, who is no longer here.  He is now in Memphis,

16    Tennessee.  His boss, who sits in Dallas, Texas, is Shannon

17    Kilpatrick, who is the regional manager, who I've met with

18    or numerous occasions and talked to and e-mailed on several

19    occasions, who has also given me permission to be at the

20    Greyhound bus station, and actually has made the statement

21    that she likes us to be at the Greyhound bus station.

22    Q.  Okay.  Thank you.  And does that include access to the

23    buses, themselves?

24    A.  I've been given permission to board buses; look at

25    luggage; be inside of the Greyhound bus station; use their

1    private rooms; use all of their facilities.

2    Q.   Okay.  And, again, this is by a Jason Reeves, who is

3    the ex-manager; is that right?

4    A.   That was the initial person, yes.

5    Q.   The current manager is Buddy Dean; is that correct?

6    A.   To my knowledge -- I haven't worked in two weeks --

7    there is no -- there is not a manager at this time, a

8    permanent manager.  They're in transition and in the

9    process of hiring a new manager.

10   Q.   Okay.  You said you served on the 24th of May of this

11   year.  You started work sometime in the morning; is that

12   correct?

13   A.   Yes.

14   Q.   Okay.  You went to your office to do paperwork?

15   A.   That's my normal practice.  I would assume that's what

16   I did on that date.

17   Q.   Okay.  So you can't actually testify that on this date

18   you did that, though?

19   A.   No, I can't.

20   Q.   But you do recall going to Amtrak first?

21   A.   Yes, I do.

22   Q.   And what time did you go to the Amtrak?

23   A.   Depending on what time the train comes in on this

24   date -- obviously, it was before 11:00 a.m.  So I don't

25   remember the exact time that I went, but it was before

```
 1    11:00 a.m.

 2    Q.  And I think you stated that the Amtrak and Greyhound

 3    are quite close?

 4    A.  Yes.  They're in the same station.

 5    Q.  You just went straight over to the Greyhound?

 6    A.  I'm sorry?  I don't understand your question.

 7    Q.  From the Amtrak, you went straight over to the

 8    Greyhound?

 9    A.  Yes, sir.

10    Q.  Okay.  And did you go through the lobby sitting area?

11    A.  No, I did not.  I believe I went straight from the

12    Amtrak, straight to the bus, because the bus was already

13    boarding.

14    Q.  Okay.  Just to save time; is that right?

15              MR. BRAUN:  Objection; relevance.

16              THE COURT:  If the witness can answer it, he can.

17    If not, let's move on.

18    A.  The bus was already boarding, so I wished to speak with

19    the passengers as they were on the bus.  That's the reason

20    I went straight to the bus.

21    Q.  Okay.  Let me see.  When you got onto the bus, how many

22    passengers, approximately, were on the bus?

23    A.  I don't recall.  I know the whole -- the area in the

24    back, the passengers were already seated.  I can't remember

25    exactly how many passengers were on the bus on that date.
```

1    Q.  Do you know how many passengers a bus of that type can

2    carry?

3    A.  It depends on the size of the bus.  Anywhere from 51 to

4    55 passengers.

5    Q.  And this bus was fairly full; is that right?

6    A.  There were empty seats.  I can't remember exactly how

7    many passengers on this date.

8    Q.  Do you recall whether the bus was the same as almost

9    all the seats were occupied?  Or do you recall?

10   A.  I'm sorry?  Can you repeat that?

11   Q.  Do you recall whether the same as almost -- the bus was

12   mostly occupied or mostly unoccupied?

13   A.  I don't remember the passengers, but the majority of

14   the seats had passengers in them.

15   Q.  Okay.  Would you say more than 75 percent of the seats?

16   A.  I can't speculate on the amount.

17   Q.  Okay.  You don't recall?

18   A.  No.

19   Q.  Now, you said you were armed that day; is that correct?

20   A.  Yes, sir.

21   Q.  That's your habit?

22   A.  Yes.

23   Q.  What kind of firearm do you carry?

24           MR. BRAUN:  Objection; relevance.

25           THE COURT:  Why is that relevant here?

1                    MR. KNOBLAUCH:  I want to know what size it is.

2                    THE COURT:  Why is it relevant?

3                    MR. KNOBLAUCH:  Because if it's a large firearm,

4        then passengers see the large firearm, and that can, you

5        know, have definitely an effect on somebody's ability to

6        consent or not consent to search.

7                    THE COURT:  Overruled.  I'll permit the question.

8        Q.  (By Mr. Knoblauch)  What kind of firearm were you

9        wearing?

10       A.  I carry a Glock .27.

11       Q.  How large is that?

12       A.  Pardon?

13       Q.  How large is that?

14       A.  I don't know the dimensions.

15       Q.  Okay.  Would you classify it as being a large handgun?

16       A.  No.  I would actually say it's kind of small.

17       Q.  Is it, say, smaller than a Colt Model 1911?

18       A.  I'm not a gun person, so I don't know what a Colt Model

19       1911 is.

20       Q.  All right.  Thank you.  Now, you've listened to the

21       wellness recording, haven't you?

22       A.  Yes, sir, I have.

23       Q.  And you listened to it before court today?

24       A.  I've listened to it numerous times, yes.

25       Q.  And, in general, with the exception of a few typos or

1    glitches or something like that, it seems to be fairly

2    accurate; is that correct?

3    A.   What seems to be fairly accurate?

4    Q.   Of what actually -- what actually occurred.  Some of

5    the things you can't actually identify because it's

6    unintelligible; is that correct?

7    A.   Some things you can't, no.

8    Q.   Okay.  Now, when you record these stops, record these

9    encounters, when do you start the recording?

10   A.   Well, on a normal day, which this wasn't, I board the

11   bus, and prior to the first passenger coming on the bus, I

12   turn my recorder on, before I speak with the very first

13   passenger.  On this date, I probably turned -- I think I

14   turned my recorder on prior to walking up the steps of the

15   bus because I knew there was already passengers on the bus.

16   Q.   Okay.  And when do you stop the recording?

17   A.   It depends on what happens on the bus.

18   Q.   Okay.  What criteria do you use to determine whether or

19   not to stop the recording?

20   A.   Well, if I complete checking the bus and we're finished

21   and no one is either arrested or we don't make a seizure, I

22   turn my recorder off.  If there is an arrest or a seizure,

23   when the arrest is completed, I turn my recorder off.

24   Q.   In this instance, you turned your recorder off when you

25   left the bus; is that correct?

1    A.  In this case?

2    Q.  Yes.

3    A.  No.  I was still on the bus when I turned my recorder

4    off.

5    Q.  So you were still on the bus.  And why did you turn it

6    off at that point?

7    A.  As I stated earlier, as soon as the arrest is completed

8    and, generally, the handcuffs are on, that's when I turn

9    the recorder off.

10   Q.  So nothing that occurred after you arrested Mr. Wellams

11   was recorded at all; is that right?

12   A.  No, there was nothing recorded after the arrest was

13   completed.

14   Q.  Now, on direct examination, I believe you testified

15   that you asked Mr. Wellams for his bus ticket; is that

16   correct?

17   A.  Yes, I did.

18   Q.  And then you asked him if he had any luggage; is that

19   correct?

20   A.  Yes, I did.

21   Q.  Okay.  And then you asked him if you could examine his

22   pillow; is that correct?

23   A.  I believe I asked to search it, yes, I did.

24   Q.  And is it your testimony today that it happened in that

25   order?

1    A.  I forget what order you even said the questions in.

2    Q.  Okay.

3    A.  So can you repeat them again?

4    Q.  Okay.  You said that you asked Mr. Wellams for his bus

5    ticket?

6    A.  Yes.

7    Q.  Then you asked him if he had any luggage; is that

8    correct?

9    A.  I'm trying to recall what order I asked them in.

10         MR. BRAUN:  Your Honor, I would object.  The

11   recording speaks for itself.

12         THE COURT:  It does speak for itself here,

13   counsel.

14         MR. KNOBLAUCH:  Okay.

15   Q.  (By Mr. Knoblauch)  Now, you asked Mr. Wellams for his

16   pillow, and you asked the previous gentleman for his

17   pillow; is that correct?

18   A.  I didn't ask them for their pillow.  I asked them for

19   consent to search it for contraband.

20   Q.  Now, you had seen these pillows before; is that right?

21   A.  I have seen those pillows before, yes.

22   Q.  Okay.  They sell them in the bus stations; is that

23   right?

24   A.  They actually do sell them at the Greyhound bus station

25   here in Albuquerque, yes.

1    Q.  Now, Mr. Wellams never gave you permission to search

2    him, did he?

3    A.  No, he did not.

4    Q.  Okay.  And when you -- when he indicated basically a

5    reluctance to being searched, you kept after him, didn't

6    you?

7    A.  Well, first of all, your statement was "a reluctance."

8    I don't think there was a reluctance.  He was questioning

9    about the search.  He asked various questions.  And your

10   statement or your question was "kept after him."  I did ask

11   him more questions, yes.

12   Q.  And when Mr. Wellams, referring to Page 12 of the

13   transcript, Line 18 --

14         MR. BRAUN:  I would ask if the witness could be

15   provided with a copy of the transcript?

16         THE COURT:  That's right.

17         MR. KNOBLAUCH:  May I approach?

18         THE COURT:  You may.

19   Q.  (By Mr. Knoblauch)  Okay.  Mr. Wellams asked you, in

20   response to, I believe, your third or fourth time of asking

21   if you could search him, he said, "Is that necessary?"  Is

22   that correct?  That's Page 12, Line 18?

23   A.  To answer your question, I don't recall asking him

24   three or four times to search him.  And he did ask, "Is

25   that necessary?" I believe on two occasions that I

1     remember.

2     Q.  And your response to him saying, "Is that necessary?"

3     was, "Okay.  All right.  Can you lift up your shirt?"

4     A.  That was at the very end of the questioning, yes, I did

5     ask that.

6     Q.  You don't recall three or four different times -- okay.

7     Going back to Page 10 --

8            MR. KNOBLAUCH:  If I might approach?

9     Q.  Okay.  Now, Agent Perry, looking at Page 10 --

10    okay?  And he asked you on Page 10, Lines 22 and 23,

11    "How about your person, sir?  You don't have any weapons

12    or anything strapped to your person?"  Right?  Have you

13    got that?

14    A.  Yes, I see that.

15    Q.  Okay.  And then on Page 11, we have Lines 3 and 4,

16    "Would you give me consent to search your person for

17    contraband?"  Is that right?

18    A.  Yes, I see that.

19    Q.  And he did not give you permission there, did he?

20    A.  No.  He asked the question.

21    Q.  And, in fact, in response to that, Pages 7 and 8, again

22    he asked, "Is it necessary?"  Is that correct?

23    A.  Yes, after he said, "I don't have a problem with that,

24    no."  "Is it necessary?"

25    Q.  And then Page 11, Lines 9 and 10, you ask, "I'm asking

1    for permission."  Is that correct?

2    A.  Yes, that's what it says.

3    Q.  Okay.  Is that correct?  You asked him for permission

4    again; is that correct?

5    A.  No.  I don't think I'm asking.  I'm clarifying.  He's

6    asking me if it's necessary, and I didn't tell him, but

7    basically I was answering his question, that it wasn't

8    necessary.  I'm asking him for permission to do it.

9    Q.  So you were asking him for permission again?

10   A.  No.  I'm clarifying.  I'm answering his question.

11   Q.  Okay.  So you're not asking the question again; you're

12   just clarifying.  Okay.  And, again, on Page 12, Lines 8

13   and 9, "Would you give me permission to conduct a search of

14   your person?"  Is that correct?

15   A.  Yes.

16   Q.  Okay.  That's three.  Okay?

17   A.  I don't -- I don't agree.

18        MR. BRAUN:  I'm sorry.  I would object to that

19   characterization.  He is asked once, at Lines 3 and 4 of

20   Page 11.  The defendant said, "I don't have a problem with

21   that," then asked questions.

22        At Lines 8 and 9, that Mr. Knoblauch just

23   referred to on Page 12, that's the second time he asked,

24   and it was only after Mr. -- after the defendant had asked

25   the questions.

```
 1              THE COURT:  The Court will have to reconcile all
 2       of this.  Let us proceed here, Mr. Knoblauch.
 3              MR. KNOBLAUCH:  Okay.
 4       Q.  (By Mr. Knoblauch)  The bottom line is, Mr. Wellams
 5       never gave you permission to search, did he?
 6       A.  He didn't come out and say "No" or "Yes."  He didn't
 7       give me permission, no.
 8       Q.  Now, let me see.  You never saw Mr. Wellams before
 9       meeting him on that bus, did you?
10       A.  I'm sorry?  I couldn't hear the question.
11       Q.  You have never in your life seen Mr. Wellams before
12       meeting him on the bus on the 24th of May, have you?
13       A.  If I have, I don't recall it.
14       Q.  And you have no indication at all that Mr. Wellams
15       might be a dangerous person, do you?
16       A.  I don't know anything about Mr. Wellams, other than the
17       fact of what happened on this date.
18       Q.  Okay.  And there is absolutely no indication Mr.
19       Wellams was carrying a weapon, was there?
20       A.  When you say "no indication," I don't know who's
21       carrying a weapon or not.  I have no idea.
22       Q.  So it could have been anyone on that bus could have
23       been carrying a weapon; is that right?
24       A.  That's correct.
25       Q.  You saw nothing that Mr. Wellams in particular was
```

1    carrying a weapon, did you?

2    A.   No.  I didn't have any reason to believe that he had a

3    weapon with him.

4    Q.   Okay.  And you never told Mr. Wellams he was free to

5    refuse a search of his person, did you?

6    A.   No, I did not.

7    Q.   Although he kept asking you, didn't he?

8    A.   I really don't understand your question.

9    Q.   He asked you, "Is this necessary?" several times, did

10   he not?

11   A.   I believe he asked that two -- two times, as I

12   remember.

13   Q.   And you never told him it was not necessary, did you?

14   A.   Well, I answered the question that he asked, that I was

15   asking permission.  Basically, to me, that is answering the

16   question, that you don't have to -- you don't have to give

17   permission.  It's not necessary.  I'm asking you for

18   permission to do it.

19   Q.   All right.  "Yes" or "No"?  You did not tell him it was

20   not necessary for him to give you permission, did you?

21   A.   As I testified earlier, no, I did not.

22   Q.   Okay.  Thank you.

23           MR. KNOBLAUCH:  Nothing further.

24           THE COURT:  Any further need of the witness here,

25   Mr. Braun?

1        MR. BRAUN:  Yes, Your Honor, if I could ask just

2   a few redirect questions?

3        THE COURT:  All right.

4                    REDIRECT EXAMINATION

5   BY MR. BRAUN:

6   Q.  Agent Perry, Mr. Knoblauch asked you about how full the

7   bus was, and you said you couldn't recall; is that right?

8   A.  Yes, sir.

9   Q.  You testified earlier, I believe, that passengers were

10  still boarding the bus when you began your consensual

11  encounters?

12  A.  Yes, sir, that's correct.

13  Q.  So had all the passengers been seated by the time you

14  got to the defendant?

15  A.  No, they were not.

16  Q.  Where was the defendant seated in relation to the front

17  or the back of the bus?

18  A.  He was seated approximately seven to eight seats from

19  the rear of the bus, on the left-hand side, in the window

20  seat.

21  Q.  And as you were engaging him in a consensual encounter,

22  were you looking around to see whether other people were

23  entering the bus or taking their seats?

24  A.  No, I was not.  I was concentrating on Mr. Wellams.

25  Q.  Mr. Knoblauch asked you about when you stopped

 1    recording the encounter.  What is your purpose -- your

 2    purpose -- in recording these encounters?

 3    A.  The reason that I record, and we started recording and

 4    continue to record, is to show the consensual contact;

 5    basically, the consensual person giving permission to speak

 6    with him and the consensualness of the search.  That's

 7    basically the reason we record, to show that it's a

 8    consensual encounter, it's a consensual search.

 9    Q.  For that purpose, once the arrest is made, there is no

10    need to record any further?

11    A.  That's correct.

12          MR. BRAUN:  Let me get a clean copy of the

13    transcript.  May I approach the witness?

14          THE COURT:  You may.

15    Q.  Handing you the transcript, Exhibit 1-A, Mr. Knoblauch

16    asked about the order of the questions.  On the transcript,

17    does it reflect whether you asked about the luggage before

18    you asked about the ticket?

19    A.  Yes, it does.

20    Q.  What does it reflect?

21    A.  I asked him if he had any luggage with him on the bus;

22    then I asked him if he had his ticket with him.

23    Q.  And did you hear that as you listened to the recording?

24    A.  Yes, I did.

25    Q.  Is that accurate?

1    A.  Yes, it is.

2    Q.  Okay.

3            MR. BRAUN:  Nothing further.  Thank you.

4            THE COURT:  All right.  Agent, let me ask you a

5    question.

6            MR. KNOBLAUCH:  Your Honor, I would like one

7    question, follow-up.

8            THE COURT:  All right.  Go ahead.

9                        RECROSS EXAMINATION

10   BY MR. KNOBLAUCH:

11   Q.  Agent Perry, was there anything in the world to prevent

12   you from turning your recorder back on?

13   A.  No.  I can turn my recorder on or off whenever I

14   choose.

15   Q.  So you could have -- after taking Mr. Wellams off the

16   bus and returning to the bus, you could have turned it back

17   on at that point?

18   A.  Yes, I could have.  Yes.

19   Q.  Okay.

20           MR. KNOBLAUCH:  Thank you.

21           THE COURT:  Agent, specifically what was it about

22   this passenger that caused you to follow through the steps

23   and the questions that you did, as compared to other

24   passengers that you obviously encountered on the bus that

25   day?

 1           THE WITNESS:  Well, Your Honor, basically the

 2     passenger that was seated across from him, Mr. Wellams, I

 3     spoke with him more at length, and I asked them for their

 4     tickets for a reason.  The reason for that was both of them

 5     told me they had no luggage with them.  And the first

 6     passenger was traveling from Phoenix to Memphis.  He lived

 7     in Memphis.

 8           Specifically, just like with Mr. Wellams, he

 9     lived in Michigan, was traveling to Memphis, and had been

10     in Arizona.  That's three different states.  He had no

11     luggage with him at all.  To me, that's odd from what a

12     normal passenger travels with.  I speak with passengers,

13     numerous passengers, hundreds of passengers daily on

14     different buses and on the train, and the majority of

15     passengers that are normal travelers have some type of

16     luggage with them, either checked in or carried on.

17           Mr. Wellams had no type of luggage, so that's the

18     reason that I went and asked him for his ticket and then

19     asked him more questions.  Plus, his dress.  He had a

20     loose-fitting shirt on that was untucked, that covered up

21     his whole -- basically, from his knees to his upper body.

22     That's the reason that I subsequently asked him for consent

23     to lift up his shirt.

24           Also, Your Honor -- if I may continue with my

25     answer?


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico 87102

1              THE COURT:  Go ahead.

2              THE WITNESS:  When speaking with Mr. Wellams,

3      every question that I asked him from the beginning, as far

4      as where he was traveling to, if the pillow belonged to

5      him, for his ticket, he didn't question anything.  And when

6      I got to the point about his person, searching his person,

7      that's when he started asking questions.  Did that raise my

8      suspicion a little bit?  Yes.

9              THE COURT:  Why would it?  Wouldn't that be a

10     natural response?

11             THE WITNESS:  From my experience, no, ma'am, not

12     from passengers on the bus.  I conduct -- well, the

13     passenger that was seated just directly across from him, as

14     you heard on the tape, I'm not saying every person gives

15     permission to search their person.

16             Some people do question it, but that's not a

17     normal response from a normal passenger that I speak with

18     on the bus.

19             THE COURT:  All right.  In light of the Court's

20     questions, are there any other questions here?

21             MR. BRAUN:  Not from the government.

22             THE COURT:  Mr. Knoblauch?

23             MR. KNOBLAUCH:  No, Your Honor.

24             THE COURT:  Okay.  Just give me a moment here.

25     All right.  Sir, I do excuse you at this time.

1                    THE WITNESS:  Thank you.

2                    THE COURT:  Did the parties want the copy that

3      was provided to the Court to be the original, as far as the

4      exhibits are concerned?

5                    MR. BRAUN:  Yes, Your Honor, that would be fine.

6                    THE COURT:  All right.  Any other witnesses?

7                    MR. BRAUN:  None from the government.

8                    THE COURT:  All right.  Counsel?

9                    MR. KNOBLAUCH:  Not for the defendant, Your

10     Honor.

11                   THE COURT:  All right.  Is there any other

12     evidence that is going to be presented here?  First of all,

13     Mr. Knoblauch?  This is your motion.

14                   MR. KNOBLAUCH:  I have no evidence at this point,

15     Your Honor.

16                   THE COURT:  Okay.  Mr. Braun?

17                   MR. BRAUN:  No, Your Honor.

18                   THE COURT:  All right.  Let's have some argument

19     on this, and I'm going to invite, of course, the movant --

20     I want you to take me step-by-step and inform me of the

21     basis, specifically based on the facts, the evidence that

22     we're heard, that would cause you to seek the relief that

23     you have pled here.

24                   MR. KNOBLAUCH:  Your Honor, I think this is

25     patently a Fourth Amendment violation.


                     JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                            333 Lomas Boulevard, Northwest
                            Albuquerque, New Mexico 87102

1    Agent Perry went on the bus, doing his job, and

2    he's going through the passengers.  And when he gets to the

3    defendant, the defendant displays marked reluctance to a

4    body search.  Agent Perry has candidly said that he did not

5    get permission to search.

6    Your Honor, lifting up the shirt -- lifting up

7    the shirt is a search.  Your Honor, this does not fall

8    within the parameters of a Terry stop or anything else.

9    There has been absolutely no indication of any kind of

10   danger, any kind of weapon involved, or anything else.

11   Agent Perry is just searching Mr. Wellams because

12   he suspects that Mr. Wellams has something.  However, he

13   does not have any probable cause.  He does not have a

14   warrant.  He has nothing.

15   THE COURT:  Well, he has got a concern that

16   here's someone traveling a great distance, who doesn't have

17   luggage.

18   MR. KNOBLAUCH:  Many people travel great

19   distances without luggage.  There is actually no

20   requirement that people carry luggage with them when they

21   travel.  Fortunately, we have not come that far in this

22   country that we have to require people to carry that sort

23   of thing, or we'd be struggling legitimately.

24   What we have is a citizen of the United States

25   traveling with public transportation and being accosted by

1    an officer of the law; and the officer of the law, rather

2    than backing down when he should have backed down, kept

3    boring in, when the defendant kept asking, "Do I have to do

4    this?  Do I have to do this?"

5            And the agent is evading the question and just

6    saying, "Do this.  Do this.  Lift up your shirt."

7            I would submit to the Court, Your Honor, that

8    this is a search that is done as an order by this

9    officer.

10           The couching of it is, "Can you lift up your

11   shirt?"  Your Honor, that is not a request.  That's an

12   order.  Under these circumstances, crowded bus, it's

13   unquestionably an order from the officer.  At that point,

14   there is no consensual search.

15           THE COURT:  Go ahead.

16           MR. KNOBLAUCH:  As a consequence, everything

17   flowing from that search must be suppressed.  The arrest,

18   anything that is discovered as from escorting Mr. Wellams

19   off the bus, everything from that point on is a fruit of

20   the poisonous tree, and it must all be suppressed.  I think

21   it is quite clear.

22           And I would ask the Court to let us submit

23   memorandums to that effect.

24           THE COURT:  All right.  Let me hear from you, Mr.

25   Braun.

1          MR. BRAUN:  Well, first of all, Your Honor, I

2     think it's clear that Agent Perry is fully entitled to

3     engage in consensual encounters with passengers on the bus,

4     and I don't think the defendant is disputing that.  And it

5     doesn't sound like the defendant is disputing that this

6     particular encounter began as a consensual encounter; that

7     when Agent Perry first approached him and said, "I'm a

8     police officer, may I speak with you for a moment?" the

9     defendant responded, as Agent Perry testified, by nodding

10    and quietly saying, "Yeah."

11         And then Agent Perry asked the question, "Where

12    are you coming from?  Where are you going to?  Where do you

13    live?"  Those types of questions.

14         And, again, this was a conversational tone.

15    There was nothing intimidating about what Agent Perry was

16    doing.  He did not have his gun drawn.  It wasn't even

17    visible.  He was dressed in plainclothes.  And there were

18    many other people on the bus.  So it's not a coercive

19    atmosphere, where it's just Agent Perry with the defendant

20    and just the two of them in a room.  They're surrounded by

21    people.  It's not a coercive environment whatsoever.

22         Now, while the questioning of the defendant may

23    have raised Agent Perry's suspicions, he didn't do anything

24    with those suspicions, such as detaining the defendant

25    based on reasonable suspicion or anything like that.  It

1     just caused him to continue the encounter in a perfectly

2     lawful way.  He continued the consensual encounter.

3            Now, the Court can hear on the recording the

4     consensual encounters that occurred before this and how

5     quick they were because there was nothing that raised Agent

6     Perry's suspicion.  And so he would ask them a few

7     questions, then move on to the next person.  When he got to

8     the defendant, there were suspicions based on the lack of

9     luggage.

10            THE COURT:  Is that enough?

11            MR. BRAUN:  It's enough for him to continue the

12     encounter.  There's nothing unlawful at that point.  He's

13     continuing a consensual encounter.  The defendant certainly

14     hasn't terminated the encounter, hasn't indicated any

15     desire to leave.  Agent Perry testified that he didn't say,

16     "I don't want to speak to you anymore."  It continued to be

17     a consensual encounter.

18            At that point, Agent Perry asked if he could

19     search the defendant's person.  The defendant never gave a

20     clear answer.

21            Mr. Knoblauch wants to say that Agent Perry

22     hounded him or bored in on him, but he didn't do that.  As

23     is clear from listening to the recording and reading the

24     transcript, all Agent Perry was doing was attempting to

25     answer the defendant's questions.  And every time Agent

1    Perry would ask a question, the defendant would answer with

2    a question.

3              If we start at Page 10 of the transcript, at

4    Lines 23 and 24, I guess 22 through 24:

5              "How about on your person, sir?  You don't have

6    any weapons or anything strapped to your person?"

7              Mr. Wellams' question:  "On my person?"

8              Agent Perry:  "Yeah, on your body?"

9              Answer:  "No, sir."

10             "Okay.  Would you give me consent to search your

11   person for contraband?"

12             Mr. Wellams answers the question with a question:

13   "You want to search my person?"

14             "Yes."

15             Mr. Wellams:  "I don't have a problem with that,

16   no."

17             So he's saying he doesn't have a problem with

18   that.  That is, in effect, giving consent at that point.

19             But then he asks:  "Is that necessary?"

20             And so Agent Perry has to answer that:  "Well,

21   sir, it's not.  I'm asking you for permission."

22             So in response to Mr. Knoblauch's question about

23   whether Agent Perry ever said it wasn't necessary, Agent

24   Perry did say:  "It's not necessary.  I'm asking for your

25   permission."

```
 1              There's nothing whatsoever coercive about this.
 2     The defendant has already said he doesn't have a problem
 3     with it.  What he's asking is if it's necessary.  Agent
 4     Perry is saying, "No, it's not necessary.  I'm asking for
 5     your permission."  Then the defendant says that he doesn't
 6     understand, "you're throwing me off," and so Agent Perry
 7     then goes on to just explain why he's there, why he's doing
 8     this.
 9              Again, nothing coercive.  He's not trying to
10     intimidate the defendant.  He's trying to explain why he's
11     there, why he's doing what he's doing, in response to a
12     specific question from the defendant.  And, again, this is
13     after the defendant has said that he doesn't have a problem
14     with the search of his person.
15              So then the defendant asked at Lines 10 and 11 of
16     Page 12, after Agent Perry has explained to him why he's
17     there, why he's doing this, Mr. Wellams asks, "We need to
18     leave out of here?"
19              Agent Perry doesn't hear him.  He asked it again,
20     and Agent Perry says, "No."
21              And I think that's a typo there.
22              THE COURT:  Yes.
23              MR. BRAUN:  It should be "Male Officer."
24              Agent Perry says, "No, we don't need to go
25     anywhere, sir, unless you want to go somewhere.  It's up to
```

1    you," again making it very clear.  Mr. Wellams is not

2    detained.  This is not coercive.  It's purely voluntary.

3              And so at that point, Mr. Wellams again asks, "Is

4    that necessary?"

5              And so at that point, Agent Perry -- okay.  He is

6    clearly not getting anywhere with asking to search the

7    person, so he asks, "Will you lift up your shirt?"

8              Again, as Agent Perry testified, he's asking for

9    the defendant to voluntarily lift up his shirt.  It's not a

10   command.  And in response, as a nonverbal consent, the

11   defendant responds by lifting up his shirt.

12             At that point, when he voluntarily lifts up his

13   shirt in response to a question, Agent Perry sees the

14   bundle.  And from his years of doing interdiction work,

15   from over 1,000 drug seizures, hundreds of seizures of

16   contraband when it's wrapped, taped to a person's body, he

17   knows what he's looking at.  And he knows, at that point,

18   that's illegal drugs.

19             And so he has probable cause to arrest the

20   defendant at that point.  And so, at the very least, he has

21   Terry reasonable suspicion to pat the defendant down to

22   either confirm or dispel his suspicions.

23             THE COURT:  The Court understands that.  I think

24   the focus is really on the time span that began from the

25   first words the agent stated to this passenger, to the

1    point that the shirt was raised and the bundle was noticed.

2    That's really the focus.

3          MR. BRAUN:  Okay.  So if probable cause isn't the

4    question, then really what --

5          THE COURT:  For me, after hearing the evidence, I

6    think that is the focus at this point, because that is

7    going to determine, obviously, the consequences of what was

8    later discovered and what was done.

9          MR. BRAUN:  Right.  And our position is, from

10    listening to the audio, from reading the transcript, it's

11    very clear that this is a noncoercive consensual encounter,

12    where the defendant has made it clear he doesn't have a

13    problem with a body search, but then asks, "Is it

14    necessary?" and then asks several questions that Agent

15    Perry is trying to answer in a noncoercive way.

16          And finally, after this back-and-forth questions

17    and answers, Agent Perry simply asks, "Will you lift up

18    your shirt?"  And in response, the defendant does so.

19          He's not responding to a command.  He's

20    responding to a request for him to voluntarily do so.  And

21    of course by voluntarily lifting up his shirt, there was no

22    Fourth Amendment violation whatsoever.

23          THE COURT:  Mr. Knoblauch, do you agree that the

24    typo should be corrected here on Page 12, Line 15?  It

25    should actually read "Male Officer," as opposed to

1    "Mr. Wellams?"

2              MR. KNOBLAUCH:  Your Honor, I agree that is a

3    typo.

4              THE COURT:  Yes.  The record will reflect that.

5    Do you want to respond any further here, Mr. Knoblauch?

6              MR. KNOBLAUCH:  Just quickly, Your Honor.  As

7    Agent Perry testified, Mr. Wellams did not give him

8    permission to search him.  I have absolutely no reason to

9    doubt that at all.  Agent Perry was there.  Agent Perry has

10   not only what the Court has, which is the recording, but

11   Agent Perry saw what was going on, and he says he did not

12   have permission to search Mr. Wellams.  We can take that as

13   a given.

14             Your Honor, any consent to search under these

15   circumstances must be clear and unequivocal.  Under any

16   interpretation of what's going on here, we do not have a

17   clear and unequivocal permission to search.  We do not have

18   any sort of exigent circumstances.  We just have a search.

19             Thank you.

20             THE COURT:  All right.  I'm not sure that the

21   Court really needs any further argument on this, but if you

22   want to submit something within seven days, seven calendar

23   days, I'll permit that opportunity.

24             Did you want that, Mr. Knoblauch?  I think you

25   referenced it earlier?

1            MR. KNOBLAUCH:  Yes, Your Honor.

2            THE COURT:  All right.  No more than ten pages.

3            MR. KNOBLAUCH:  Okay.

4            THE COURT:  And simultaneously.  There will be no

5    responses, no replies.

6            MR. BRAUN:  Yes, Your Honor.

7            THE COURT:  Within seven calendar days of today.

8    Again, no replies, no responses, simultaneous.  And the

9    Court will take the matter under advisement.

10           MR. BRAUN:  And, Your Honor, it will probably be

11   Ms. Henderson who will do the briefing.  I'm not sure how

12   long it will take to get an expedited order of the

13   transcript, but perhaps --

14           THE COURT:  Let me clarify something.  Is there

15   anything else we need to bring up on the record?

16           MR. KNOBLAUCH:  I don't think that we need to.

17           THE COURT:  Okay.  We're going to stand in recess

18   at this time as to this matter.

19           THE COURT:  Let me have counsel approach.  We're

20   not on the record, Julie.

21           (A discussion was held at the bench, off the

22           record.)

23           THE COURT:  Back on the record here for just a

24   minute, Julie.  I'm going to extend that time for

25   submitting any written argument to ten days, with the

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico 87102

1    understanding that should one party or the other request

2    an extension due to hardship here with, obviously, the

3    assigned Assistant U.S. Attorney due to severe illness of a

4    close family member, that the Court will reasonably extend

5    that deadline.  And I think Mr. Knoblauch agrees with that,

6    as well.

7              MR. KNOBLAUCH:  Yes.

8              THE COURT:  Yes, under the circumstances.  So

9    just let the record reflect that.  And I think that the

10   parties may be ordering a transcript, as well, and that

11   preparation time may figure into that as well.  All right.

12             We are now off the record again.  Thank you,

13   counsel, for your arguments, your appearances.  Counsel,

14   nice to meet you this afternoon.

15             MS. RUIZ-VELEZ:  Nice to meet you.

16             THE COURT:  All right.  We'll stand in recess as

17   to this matter.  Thank you.

18             (Proceedings concluded at 3:47 p.m.)

19

20

21

22

23

24

25

1

2                        REPORTER'S CERTIFICATE

3            I, Julie Goehl, RDR, RPR, RMR, CRR, CCR #95,

4      Official Court Reporter for the United States of

5      America, do hereby certify that I did report in

6      stenographic shorthand the proceedings set forth

7      herein, and that the foregoing constitutes a true and

8      correct transcription of the proceedings.

9            In testimony whereof, I have hereunto set my hand on

10     this 4th day of October, 2012.

11

12                   _____

13

14                        JULIE GOEHL
                          Registered Professional Reporter
                          Registered Merit Reporter
15                        Certified Realtime Reporter
                          NM Certified Court Reporter #95
16                        333 Lomas Boulevard, Northwest
                          Albuquerque, New Mexico  87102
17                        Phone:  (505)348-2209
                          Fax:  (505)348-2315
18

19

20

21

22

23

24

25


                  JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                        333 Lomas Boulevard, Northwest
                        Albuquerque, New Mexico 87102