**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA**,

Plaintiff,

vs. No. 12-CR-1393 MCA

**ALTAR DARNELL WELLAMS**,

Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on Defendant Altar Darnell Wellams' Motion to Suppress [Doc. 30] filed August 15, 2012. [Response at Doc. 39] On October 3, 2012, the Court held an evidentiary hearing on Defendant's motion. At the conclusion of the hearing the Court invited further briefing, and supplemental briefs have been submitted by both parties. [Docs. 45, 46] Having fully considered the pleadings of record, the applicable law, the evidence and arguments of counsel presented at the hearing, and otherwise being fully advised in the premises, the Court grants-in-part and denies-in-part Defendant's Motion based upon the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. Agent Jarrell Perry is a special agent with the Drug Enforcement Administration (DEA) with 14 years of experience with the DEA and 6.5 additional years law enforcement experience. [Doc. 44, 6:17 to p. 7:11]

2. Among other work, Agent Perry works at the combined Amtrak train and Greyhound bus station in Albuquerque, New Mexico in an effort to interdict illegal narcotics. [Doc. 44, 8:2-13]

3. On May 24, 2012, and at all relevant times, Agent Perry has the permission of the regional manager of Greyhound to board Greyhound busses, look at luggage, use private rooms and use the Greyhound facilities In Albuquerque, New Mexico. [Doc. 44, 35:13 to 36:1]

4. Agent Perry has been with the DEA's Interdiction Unit for approximately 13 years, and has received training on performing interdiction. [Doc. 44, 8:16 to p. 9:15]

5. Agent Perry has conducted over 1,000 seizures of illegal narcotics or currency. [Id.]

6. Agent Perry has been either the case agent or co-case agent in hundreds of seizures which involved contraband strapped to a person's body. [Doc. 44, 9:21-24]

7. Agent Perry has been trained to conduct consensual encounters in his drug interdiction work. [Doc. 44, 8:16-24]

8. Agent Perry described a consensual encounter as "basically a voluntary conversation between law enforcement, a member of law enforcement and a private citizen." [Doc. 44, 13:6-9]

9. Agent Perry generally and routinely takes the following actions in conducting a consensual stop: he approaches the person, whether on or off the bus or train, displays his badge, puts it back in his left rear pocket, identifies himself as a police officer, and asks for permission to speak with the person. [Doc. 44, 12-18] If granted permission, he asks "various questions about [his or her] travel," whether the person has luggage with him or her, where he or she lives, and he may ask to see his or her bus ticket or identification. [Doc. 44, 13:18-25] If the individual has luggage, Agent Perry asks for consent to search the luggage for contraband and to search the body of the person for contraband, and then he goes to the next person. [Doc. 44, 14:1-6]

10. Passengers on a Greyhound bus must get off the bus in Albuquerque in order for the bus to be serviced. [Doc. 44, 11:22 to 12:5]

11. On May 24, 2012, by the time Agent Perry boarded the Greyhound bus on which Defendant was traveling, it was ten to fifteen minutes before the bus was scheduled to depart and the majority of the passengers had already boarded the bus. [Doc. 44, 15:5-14]

12. Agent Perry did not observe the passengers get off the bus. [Doc. 44, 15:15-20]

13. Agent Perry boarded the bus alone and was not working with another agent on May 24, 2012. [Doc. 44, 15:19-22]

14. Agent Perry walked to the rear of the bus and began speaking with the passengers that were aboard the bus. [Doc. 44, 15:9-10]

15. Agent Perry wore a side-arm which was concealed under his untucked shirt. [Doc. 44, 16:4-20] He did not display his side-arm at anytime while on the Greyhound bus or while interacting with Defendant. [Doc. 44, 16:14-20]

16. Agent Perry had his badge in his left rear pocket, and removed it and displayed it to each passenger with whom he spoke, including Defendant. [Doc. 44, 16:21 to 17:5]

17. With a recording device kept under his shirt [Doc. 44, 14:12-19, 17:16-18], Agent Perry recorded the events from approximately the time he boarded the bus until he removed Defendant from the bus. Both the transcript of the recording and the recording itself are a part of the record. [Doc. 39-1; Exhibit 1]

18. The recording and transcript accurately reflect the events of May 24, 2012. [Doc. 44, 6-18]

19. Agent Perry spoke to at least eight passengers before speaking to Defendant, asking each for permission to speak with the passenger, generally by asking, "May I speak with you for a moment?" [Doc. 39-1, 2-9].

20. Agent Perry generally asked each passenger about their travel plans, whether the passenger had any luggage and where the luggage was located. [Doc. 39-1, 1-9]

21. The recording reveals that Agent Perry's tone with each passenger, including Defendant, is conversational and polite, and not aggressive, harsh, or intimidating. [Exhibit 1]

22. Agent Perry's tone did not create a coercive environment. [Id.]

23. Just before encountering Defendant, Agent Perry encountered another passenger (unidentified passenger), a male sitting a row behind and across the aisle from Defendant. [Doc. 44, 21:7-12; Doc. 39-1, 9:9-15]

24. Agent Perry approached the individual, asked him how he was doing, and asked if he could speak to the individual for a moment. [Doc. 39-1, 7:23 to 8:2]

25. Agent Perry asked the individual where he was headed, where he was coming from and where he lived, and the individual answered each question. [Doc. 39-1, 8:4-16]

26. Agent Perry asked if the individual had luggage to which the individual responded he did not. [Doc. 39-1, 8:17-19]

27. Agent Perry asked that individual to show him his ticket and the individual complied. Agent Perry then asked "Would you consent for a search of your pillow?" [Doc. 39-1, 9:6-8] The individual responded "Yeah." [Id.]

28. Agent Perry then asked if he would consent to a search of his person for contraband. [Doc. 39-1, 9:8-15]. The transcript does not reflect a response from the passenger, but does

indicate that Agent Perry searched this individual, as Agent Perry stated: "Okay. Around your waist. Can you lean forward for me? Okay. And your legs, please. Can you stand up? Okay. Stand up. All right. Thank you, sir. Have a good trip." [Id.]

29. Agent Perry's tone was polite and respectful during the entire encounter with the unidentified male passenger and the entire encounter lasted approximately one minute and ten seconds. [Exhibit 1, 3:30 to 4:40]

30. While Agent Perry was speaking to the passenger before his encounter with Defendant, a male stated "Okay. If I could just have everybody stay in your seats, please." [Doc. 39-1, 8:23-24] Agent Perry identified this speaker as the bus driver. [Doc. 44, 19:3-9] The recording supports this testimony in that there is an overlap in voices as between Agent Perry and the male speaker. Clearly, someone other than Agent Perry asked the passengers to remain in their seats. [Exhibit 1, 4:10 to 4:20]

31. Agent Perry testified that, during the encounters, the passengers were not all seated: some were boarding the bus, some were putting their luggage up and some were standing. [Doc. 44, 19:10-19] He also testified that people could get around him getting on or off the bus. [Id.]

32. After searching the unidentified male and wishing him a good trip, Agent Perry came to Defendant. [Doc. 39-1, 9:16-23]

33. Defendant was wearing a short-sleeved, baggy, button-up dress shirt. The shirt was untucked and covered the top portion of his legs to his knees. [Doc. 44, 25:2-8]

34. Agent Perry stated "Hello, sir. How are you doing?" [Doc. 39-1, 9:16-23] Defendant responded that he was all right. [Id.]

35. Agent Perry identified himself to Defendant as a police officer and asked "May I speak with you for a moment?" [Id.]

36. The transcript does not indicate a response, nor can this Court hear or discern a response on the audio-recording. Agent Perry testified that Defendant "moved his head in an up-and-down position, and he said 'Yeah.'" [Doc. 44, 21:13-23]

37. Agent Perry showed Defendant his badge when he identified himself as a police officer. [Id.]

38. Agent Perry asked where Defendant was headed. [Doc. 39-1, 9:18-21] Defendant stated that he was traveling from Arizona to Memphis but lived in Michigan. [Doc. 39-1, 9:18 to 10:9]

39. When asked, Defendant stated that he did not have luggage. [Doc. 39-1, 10:10-14]

40. Once Defendant stated he had no luggage, Agent Perry asked to see Defendant's ticket and then asked for consent to search Defendant's pillow, to which Defendant said, "No problem." [Doc. 39-1, 10:15-21]

41. The conversation continued as follows:

> Male Officer: Okay. Thank you. How about on your person, sir? You don't have any weapons or anything strapped to your person?
> Mr. Wellams: On my person?
> Male Officer: Yeah, on your body.
> Mr. Wellams: No, sir.
> Male Officer: Okay. Would you give me consent to search your person for contraband?
> Mr. Wellams: You want to search my person?
> Male Officer: Yes.
> Mr. Wellams: I don't have a problem with that, no. Is it necessary?
> Male Officer: Well, sir, it's not - I'm asking for your permission. That's basically what we do here.
> Mr. Wellams: Oh, okay. Well, I'm just saying I don't really understand what the problem is. You're kind of throwing me off for my first time being on the bus and all.

Male Officer: Well, it's just - what we do is we check the bus down here for security, sir.
Mr. Wellams: Okay.
Male Officer: And the reason we do that is sometimes we find that people will have stuff - there's no security when you boarded. Sometimes we find out people transport things, weapons, illegal narcotics, explosives on the bus, and you'll see us talking to all the passengers. That's basically why we're here and what we're doing.
Mr. Wellams: Okay.
Male Officer: Okay. All right.
Mr. Wellams: What I'm saying is when you go to - okay, my property, fine.
Male Officer: Uh-huh. Well, sometimes we find that people have stuff strapped to their bodies too. Okay. You don't have anything strapped to you? Okay. Would you give me permission to conduct a search of your person for contraband?
Mr. Wellams: (Inaudible) we need to leave out of here?
Male Officer: I'm sorry, sir.
Mr. Wellams: Do we need to leave out of here?
Mr. Wellams [sic][1]: No, we don't need to go anywhere, sir, unless you want to go somewhere. It's up to you.
Mr. Wellams: Is that necessary?
Male Officer: Okay. All right. Can you lift up your shirt for me and show me what's underneath your shirt? Okay. What do you have here in your crotch?
Mr. Wellams: That's me.
Male Officer: That's not you sir. I can see a bundle there. It's not a weapon, is it?
Mr. Wellams: No.
Male Officer: Okay. Is it a bundle of something? Does that nod mean yes?
Mr. Wellams: Yes.
Male Officer: Okay. Is it something illegal?
Mr. Wellams: (Inaudible).
Male Officer: Okay. All right. Go ahead and – I want you to go ahead and put your hands up here so I want to make sure it's nothing. Go ahead and stand up for me. No, don't touch nothing. Just go ahead and stand up for me. Okay. Put your hands up here. I tell you what, turn around, put your hands behind your back. Give me your other hand, sir. Relax, sir. Let your hands go. Turn your hand like this. Just relax, man. I'll be getting out of your way in just a second. Step on over here. Do you have anything else on your person?
Mr. Wellams: Just that.
Male Officer: Is it just weed? Okay.
[Recording concludes.]

[Doc. 39-1, 10:22 to 12:25]

---

[1]The parties agree that though the transcript indicates that Defendant made this statement, it was actually Agent Perry. Doc. 44, 59:21-23, 61:23 to 62:3]

42. Agent Perry testified that Defendant did not try to leave and Agent Perry did not prevent him from getting up and leaving. [Doc. 44, 24:8-21]

43. When Agent Perry asked Defendant to lift up his shirt, Defendant did not say no or yes but instead immediately lifted up the bottom of his shirt. [Doc. 44, 25:9-11, 46:4-7]

44. The interaction between Agent Perry and Defendant from the time Agent Perry first addressed Defendant until Defendant lifted his shirt lasted approximately one minute and forty-five seconds. [Exhibit 1]

45. Throughout his encounters with Defendant, Agent Perry was polite, non-aggressive, non-confrontational, not angry and was calm and civil in his tone of voice. No contradictory evidence was presented on this.

46. After asking Defendant to put his hands on the seat in front of him, Agent Perry felt the bundle. [Doc. 44, 26:24 to 27:7] Agent Perry removed Defendant from the bus after handcuffing Defendant. [Doc. 44, 27:13-21]

47. Agent Perry took Defendant to a private room in the Greyhound bus facility and unzipped his pants to locate the bundle, but it was not there. [Doc. 44, 27:22 to 28:3]

48. Agent Perry walked Defendant back to the bus, where a Greyhound employee handed Agent Perry a square-shaped, duct-taped bundle, which had a smaller bundle taped to it, and which ultimately tested positive for cocaine and cocaine base, respectively. [Doc. 44, 28:7-20, 29:12 to 31:1]

49. While walking Defendant off the bus the second time (as he was handcuffed), Defendant stated that he did not remove the bundle on purpose and "as we were walking off the bus, it fell off of me onto the floor." Agent Perry asked Defendant no question and made no

statement which resulted in this statement by Defendant. [Doc. 44, 28:21 to 29:16]

50. Agent Perry transported Defendant to the DEA office where Defendant was strip-searched. Defendant had duct-tape on his body, going around his waist and to his crotch. [Doc. 44, 29:18-25]

51. At the DEA office Defendant was placed in a holding cell. [Doc. 44, 29:20-25]

52. Agent Perry read Defendant his Miranda rights in the presence of another agent at the DEA office. [Doc. 44, 31:8-21]

53. Agent Perry asked Defendant if he would be willing to answer questions, to which Defendant responded yes but not without someone present to look out for his interests. [Id.] Agent Perry interpreted this statement as Defendant asking for an attorney, and did not ask any more questions of Defendant. [Doc. 44, 31:18-25]

54. Defendant subsequently made the following two statements, not in response to any questions from the agent: "I put my hand in the [expletive] cookie jar, and its still in there," and "I shove money in people's faces, and I get what I want." [Doc. 44, 31:25 to 32:11]

55. Agent Perry identified Defendant in Court. [Doc. 44, 20:25 to 21:6]

56. Agent Perry testified credibly regarding his encounters with Defendant.

## II. ANALYSIS

Defendant makes several claims in the motion to suppress:

1. "[W]hile a passenger in a Greyhound Bus," Defendant was seized and arrested without probable cause for arrest. [Doc. 30, ¶¶ 1-2]

2. Defendant was searched without a warrant. [Doc. 30, ¶ 3]

3. There were no exigent circumstances justifying a warrantees search. [Doc. 30, ¶ 5]

4. There was no consent for the search. [Doc. 30, ¶ 6]

5. Defendant was "placed into de facto arrest when Agent Perry handcuffed him and forced him to leave the bus." [Doc. 30, ¶ 8]

6. While in *de facto* arrest, but prior to being informed of his Miranda rights, Agent Perry questioned Defendant and Defendant gave potentially inculpatory statements. [Doc. 30, ¶¶ 9-10] Defendant does not identify the statements he seeks to suppress. [Id.]

For these reasons, Defendant argues that the evidence (the bundle of cocaine and cocaine base) should be suppressed and any inculpatory statements made by Defendant should be suppressed.

***Consensual Search***

> A warrantless search is per se unreasonable under the Fourth Amendment unless the government shows that the search falls within one of a carefully defined set of exceptions, such as valid consent. *United States v. Butler*, 966 F.2d 559, 562 (10th Cir.1992). "Before a district court may admit evidence resulting from a consent search, it must determine from the totality of circumstances that (1) the defendant's consent was voluntary and (2) the search did not exceed the scope of the consent." *U.S. v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1231 (10th Cir.1998). . . ."[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Therefore, "[w]hether voluntary consent was given is ... reviewed for clear error." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001). The Government establishes voluntariness only if it (1) produces clear and positive testimony that the consent was unequivocal, specific, and freely given, and (2) proves that consent was given without duress or coercion, express or implied. *Butler*, 966 F.2d at 562.

*U.S. v. Sims*, 428 F.3d 945, 952 (10th Cir. 2005). "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." *U.S. v. Guerrero*, 472 F.3d 784, 789-90 (10th Cir. 2007).

The burden is on the government to prove that an individual's consent was freely and voluntarily given. *Schneckloth*, 412 U.S. at 222.

This case clearly falls within the holding of *U.S. v. Drayton*, 536 U.S. 194 (2002). In *Drayton*, the bus driver, during a routine stop, allowed three police officers to board the bus while the driver left to complete paperwork. *Id.* at 197. One officer stayed at the driver's seat without blocking the door, another officer stayed at the back of the bus, and the third moved from the back of the bus to the front, questioning passengers as he went. *Id.* at 197-98. The questioning officer "asked the passengers about their travel plans and sought to match passengers with luggage in the overhead racks. To avoid blocking the aisle, [the officer] stood next to or just behind each passenger with whom he spoke." *Id.* at 198. The questioning officer did not inform the passengers, including Drayton and Brown (Drayton's traveling companion and co-Defendant), that they had the right to refuse to cooperate. *Id.* Approaching Drayton and Brown, the officer held up his badge to identify himself as a police officer, and, with his face twelve to eighteen inches away from Drayton, stated: "I'm Investigator Lang with the Tallahassee Police Department. We're conducting bus interdiction [sic], attempting to deter drugs and illegal weapons being transported on the bus. Do you have any bags on the bus?" *Id.* (internal quotation marks omitted). Drayton and Brown pointed to one green bag. *Id.* at 199. The officer asked "Do you mind if I check it?" and Brown responded "Go ahead." *Id.*

> Officer Lang noticed that both respondents were wearing heavy jackets and baggy pants despite the warm weather. In Lang's experience drug traffickers often use baggy clothing to conceal weapons or narcotics. The officer thus asked Brown if he had any weapons or drugs in his possession. And he asked Brown: "Do you mind if I check your person?" Brown answered, "Sure," and cooperated by leaning up in his seat, pulling a cell phone out of his pocket, and opening up his jacket. Lang reached across Drayton and patted down Brown's jacket and pockets, including his waist area, sides, and upper thighs. In both thigh areas, Lang detected hard objects similar

> to drug packages detected on other occasions. Lang arrested and handcuffed Brown. Officer Hoover escorted Brown from the bus.
>
> Lang then asked Drayton, "Mind if I check you?" Drayton responded by lifting his hands about eight inches from his legs. Lang conducted a patdown of Drayton's thighs and detected hard objects similar to those found on Brown. He arrested Drayton and escorted him from the bus. A further search revealed that respondents had duct-taped plastic bundles of powder cocaine between several pairs of their boxer shorts. Brown possessed three bundles containing 483 grams of cocaine. Drayton possessed two bundles containing 295 grams of cocaine.

*Id.* (internal citations omitted). The United States Supreme Court held that Drayton and Brown "were not seized and their consent to the search was voluntary." *Id.* at 200.

*Drayton* outlined the law applicable to the fact pattern before this Court. "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them, if they are willing to listen." *Id.* "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *Id*. at 201. The Court reiterated that the traditional test of whether a seizure has occurred based upon whether the reasonable person would feel free "to disregard the police and go about his business is not an accurate measure of the coercive effect of a bus encounter" because individuals are hesitant to leave the bus "if there is a risk it will depart before the opportunity to reboard." *Id.* at 201 (internal quotation marks and citations omitted). Thus, in determining the actual Fourth Amendment inquiry, which is to determine "whether the police conduct is coercive," the Court must determine "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id*. at 201-02. The test is based on an objective, reasonable, innocent person. *Id.* at 202. *Drayton* expanded the holding of *Florida v. Bostick*, 501 U.S. 429, 434 (1991), by holding that even where an officer does not advise passengers that they can refuse to consent to a search, the search may be reasonable considering all

of the facts. *Drayton*, 536 U.S. at 202. The Court relied on the following factors in concluding there was no seizure and the search was consensual: the officers did not brandish weapons or make intimidating movements; the officers left the aisle free so the passengers could exit; the officers spoke to the passengers one by one and in a polite, quite voice; and the officers made no threat or command, and did not use an authoritative tone of voice. *Id*. at 203-04.

Defendant attempts to avoid application of *Drayton* by arguing that he did not consent to be searched. His argument has five sub-parts: Agent Perry testified that Defendant did not give him consent to search Defendant; Agent Perry never informed Defendant that he could deny consent; rather than answer Defendant's repeated question of "Is that necessary?" Agent Perry ordered Defendant to lift up his shirt; Defendant's consent was not clear and unequivocal; and Defendant only consented based upon a show of authority by Agent Perry. [Doc. 46, 5-6] In support, Defendant cites to *United States v. Hill*, 199 F.3d 1143 (10th Cir. 1999). Defendant argues that in *Hill* the officer specifically advised the defendant he did not have to grant permission, and further argues that Agent Perry, in the present case, failed to make the same advisement. *Hill* involved a bus search similar to the one at issue here. *Id.* at 1145. The law enforcement officer boarded the bus, dressed in plain cloths, with his badge visible and his gun in its holster on his hip. *Id.* He asked the passengers about their travel plans and asked every fourth passenger if he could search their luggage. *Id.* at 1145-46. He asked the defendant to search his luggage, and informed the defendant he did not have to consent to the search. *Id.* at 1146. He was granted permission to search the bag, and double-checked, asking, "'Are you sure I can look in your bag?'" and was again granted permission. *Id.* The Court upheld the district court's determination that the search did not violate the Fourth Amendment because it was consensual. *Id.* at 1149. Viewing the totality of the circumstances,

including, but not solely based on, the officer's advisement of the defendant that he did not have to consent to the search, the Court concluded that a reasonable person would have felt free to terminate the encounter. *Id.* at 1149-50.

In citing the colloquy in Hill as being the proper measure or method of obtaining consent, Defendant appears to suggest that Agent Perry's questioning of him in the present case was constitutionally deficient. The Court rejects this contention. Here, when Agent Perry first asked for consent to search Defendant's body, Defendant answered "I don't have a problem with that, no. Is it necessary?" to which Agent Perry stated "it's not - I'm asking for your permission." [Doc. 39-1 p. 11:7-10] Had a reasonable person in Defendant's position felt or believed he had no option but to cooperate with Agent Perry, Agent Perry dispelled any such notion when he told Defendant that it was not necessary and he was asking permission. [Id. p. 12:7-22] *See Bostick*, 501 U.S. at 437; *Hill*, 199 F.3d at 1149. Based on this advisement, the Court rejects Defendant's contention that "Agent Perry never informed him that he could deny consent." [Doc. 46, p. 4]

Defendant argues that Agent Perry asked at least three times to search Defendant. The transcript supports this argument: the first request to which Defendant answered "I don't have a problem with that, no. Is it necessary?", the second request to which Defendant answered "Do we need to leave out of here?" and the third, when Agent Perry requested Defendant to lift his shirt, to which Defendant responded by lifting his shirt. [Doc. 39-1, 11-12] While Agent Perry was persistent, he was not overbearing or coercive. Of importance to this Court is that Defendant never refused consent or told Agent Perry "no." Instead, his only direct answer was that he did not have a problem with a search. The totality of the circumstances, including that Agent Perry used a polite, non-coercive tone throughout his interaction with Defendant and the other passengers, that he never

made any show of force such as brandishing his weapon or physically touching Defendant prior to Defendant lifting his shirt, that he made no commands, and that the passengers remained free to move around the bus, weigh in favor of finding that Defendant consented to lifting his shirt.

Defendant further argues that when Agent Perry said "Okay, can you lift up your shirt for me and show me what's underneath your shirt?" Agent Perry was commanding, not asking, Defendant to lift his shirt. Defendant argues: "The word 'okay' is an affirmative. The plain meaning is to give approval or indicate that something is all right or correct. When Agent Perry said "okay" in response to [Defendant's] question, he was clearly telling him that he had to lift his shirt." Defendant cites a dictionary defining "okay as meaning "all right, correct." [Doc. 46, p. 5] This Court is not persuaded that the word "okay" in this context meant "correct" or "all right," or, more importantly, was a command. Given the non-coercive, polite tone used by Agent Perry, that only Agent Perry and no other officers were present, that the conversation was short (less than two minutes), and that he specifically advised the Defendant that a search was not necessary, this Court concludes that Agent Perry did not order Defendant to lift his shirt, and further concludes that the encounter continued to be consensual. A reasonable person would have felt free to terminate the encounter with Agent Perry or refuse to lift his shirt.

Finally, though Defendant never expressly stated that Agent Perry could search him, Agent Perry testified that in response to his request for Defendant to lift up his shirt, Defendant did so. This does not mean, as Defendant argues, that his consent was equivocal. This is similar to *Drayton*, wherein the officer asked Drayton if he could check him and "Drayton responded by lifting up his hands about eight inches from his legs." *Drayton*, 536 U.S. at 199; *see also Guerrero*, 472 F.3d at 790 (holding that where the Defendant lifted his hands palm up in response to a request to search

a vehicle and testified he consented because he felt the officer was going to search the vehicle in any event, the consent was not coerced and not equivocal); *U.S. v. Gordon*, 173 F.3d 761, 765 (10th Cir. 1999) (holding that, absent a verbal response, the defendant's "voluntary relinquishment of the key evidenced his consent to search the locked duffle bag."). The lack of a verbal response does not, in this case, equate with an equivocal response.

The Court concludes that the Government has met its burden of proving that Agent Perry and Defendant engaged in a consensual encounter and that Defendant consented to lifting his shirt, resulting in Agent Perry seeing what he recognized as a bundle under Defendant's clothes. Defendant was not seized until after Defendant lifted his shirt, that is, until after Agent Perry had probable cause to arrest Defendant. The Court, therefore, will not suppress the bundles of cocaine and cocaine base and the statements made by Defendant during his encounter on the bus with Agent Perry prior to Defendant being handcuffed.

***Statements Made Post-Arrest and Prior to Miranda***

Defendant next argues that, after he was placed in *de facto* arrest, Agent Perry asked Defendant questions prior to reading Defendant the *Miranda* warning. Defendant argues that incriminating statements made by him should be suppressed. The government does not dispute that Defendant was under *de facto* arrest, but instead argues that Defendant made voluntary utterances.

The Court has identified two groups of pre-*Miranda* statements made by Defendant. *First Group*: after Agent Perry handcuffed Defendant, and prior to the administration of *Miranda* warnings, Agent Perry asked Defendant "Do you have anything else on your person?" to which Defendant answered "Just that." Agent Perry also asked Defendant "Is it just weed? Okay." The transcript does not reveal a response by Defendant. [Doc. 39-1, 13:17-19] *Second Group*: while

walking off the bus the second time, Defendant stated that he did not remove the bundle on purpose and "as we were walking off the bus, it fell off of me onto the floor." Agent Perry asked Defendant no question and made no statement which resulted in this statement by Defendant. [Doc. 44, 28:21 to 29:16]

The parties do not dispute that Defendant was in custody from the time he was handcuffed, [Doc. 30, ¶ 8; Doc. 39, 7, 11] and this Court determines for purposes of the *Miranda* analysis that Defendant was in custody from the time he was put in handcuffs. *See J.D.B. v. North Carolina*, 131 S.Ct. 2394, 2042 (2011) (holding that the ultimate inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest); *New York v. Quarles*, 467 U.S. 649, 655 (1984) (holding that the individual was in custody where he was handcuffed and surrounded by at least four police officers). Thus, the only question remaining is whether Defendant's statements were in response to interrogation.

"[A] police officer's failure to administer *Miranda* warnings prior to a custodial interrogation creates a presumption of compulsion, and the confession is inadmissible with no need for the time-consuming and difficult enquiry into voluntariness." *U.S. v. Pettigrew*, 468 F.3d 626, 635 (2006) (internal quotation marks and citations omitted).

> The Fifth Amendment provides that no "person ... shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court concluded that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id*., at 467, 86 S.Ct., at 1624. "Accordingly, the Court formulated the now-familiar 'procedural safeguards effective to secure the privilege against self-incrimination.'" *Colorado v. Spring*, 479 U.S. 564, 572, 107 S.Ct. 851, 856, 93 L.Ed.2d 954 (1987) (*quoting Miranda v. Arizona*, *supra*, 384 U.S., at 444, 86 S.Ct., at 1612). Among these is the rule that when an accused has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the

> authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981).

*Arizona v. Mauro*, 481 U.S. 520, 525-26 (1987).

The First Group of questions/answers in this case were given after Defendant was in custody but prior to any *Miranda* warnings being given. The only answer in the record is "Just that" to the question of whether Defendant had anything else on his person; however, it is unclear whether the Government may seek to admit testimony from Agent Perry regarding a response, verbal or non-verbal, to his question about whether it was "just weed." [Doc. 39-1, 13:16-19] Given the absence of *Miranda* warnings and the presumption of compulsion, the Court grants Defendant's motion to suppress with regard to these statements.

However, the exclusion of these particular statements does not automatically require the result that any subsequent statements must be excluded based on the fruits of the poisonous tree doctrine. *Pettigrew*, 468 F.3d at 635 ("[T]he Court has also declined to apply the 'fruits' doctrine to analyze the admissibility of a subsequent *warned* confession that followed an earlier violation of *Miranda*."); *see also Oregon v. Elstad*, 470 U.S. 298, 318 (1985) ("We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings."); *Bobby v. Dixon*, 132 S.Ct. 26, 32 (2011) (holding that voluntary, warned confession did not have to be suppressed though prior, unwarned, unrelated confession was properly suppressed).

The Second Group of statements by Defendant's were not in response to any interrogation or statements by Agent Perry or any other law enforcement officer. While walking off the bus the second time, Defendant stated he did not drop the bundle on purpose. This statement was not in

response to any statement or question by Agent Perry. [Doc. 44, 28:21 to 29:16] These statements will not be suppressed.

***Statements Made Post-Miranda***

Finally, after arriving at the DEA office and being given the *Miranda* warning and requesting counsel, Defendant made additional voluntary statements not in response to questioning or statements by Agent Perry or any other officer (*Third Group*). Defendant stated: "I put my hand in the [expletive] cookie jar, and its still in there," and "I shove money in people's faces, and I get what I want." [Doc. 44, 31:25 to 32:11] These statements made by Defendant were voluntary, uncoerced statements which Defendant initiated. Neither *Miranda* nor the Fifth Amendment require suppression of such voluntary statements. *Mauro*, 481 U.S. at 525-26; *see also Edwards*, 451 U.S. at 484-85 ("[A]n accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."); *Rhode Island v. Innis*, 446 U.S. 291, 300-302 (1980) (holding that "the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent" and the respondent was not interrogated where he confessed in response to short dialogue between two officers which invited no response from the respondent); *Clayton v. Gibson*, 199 F.3d 1162, 1172 (1999); (holding confession admissible after invocation of right to counsel where defendant voluntarily initiated confession); *U.S. v. de La Luz Gallegos*, 738 F.2d 378, 380-81 (10th Cir. 1984) (refusing to suppress statements made after request for attorney where statements were spontaneous and unprovoked and not in response to any accusatory statements or questions posed by law enforcement officials). Therefore, the Court denies

Defendant's Motion to Suppress with regard to these statements.

**CONCLUSION**

The Court concludes that the totality of the circumstances surrounding the encounter between Agent Perry and Defendant indicate that the encounter on the bus was consensual, and Defendant's consent to search was voluntary, clear and not equivocal. For the reasons stated above, the Court GRANTS Defendant's Motion to suppress only the statements "Just that" and any response to the question "Is it just weed?" The Court DENIES Defendant's motion to suppress the cocaine and cocaine base, the bundle, and the remaining statements identified above.

**IT IS THEREFORE ORDERED** that *Defendant's Motion to Suppress* [Doc 30] is **GRANTED-in-PART** and **DENIED-in-PART,** as set forth above.

**SO ORDERED** this 30th day of April, 2013, in Albuquerque, New Mexico.

M. CHRISTINA ARMIJO
CHIEF UNITED STATES DISTRICT JUDGE